CLASSIC INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 81–1278.

United States Court of Appeals,
First Circuit.

Argued Oct. 8, 1981.

Decided Dec. 10, 1981.

Martin J. Saunders, Pittsburgh, Pa., with whom Thorp, Reed & Armstrong, Pittsburgh, Pa., was on brief, for petitioner.

Frederick Havard, Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and W. Christian Schumann, Attorney, Washington, D. C., were on brief, for respondent.

Before CAMPBELL and BOWNES, Circuit Judges, and BONSAL,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Classic Industries, Inc., ("Classic") petitions for review of the decision of the National Labor Relations Board finding it in violation of sections 8(a)(1) and 8(a)(2) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (2),[1] and ordering it to withdraw recognition from and disestablish

---

\* Of the Southern District of New York, sitting by designation.

1. Section 8(a)(1) of the Act provides:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . .
   Section 7 of the Act provides in pertinent part:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . .
   Section 8(a)(2) of the Act provides in pertinent part:
   . . . It shall be an unfair labor practice for an employer—

   (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. . . .

an illegally dominated union, the Shop Committee. The Board cross-petitions for enforcement of its order.

In its decision, the Board mainly affirmed the findings, rulings and conclusions of the Administrative Law Judge (ALJ), and adopted his recommended order. In the following statement of facts, we follow the findings of the ALJ unless otherwise noted. Contrary to Classic's contentions, we believe the ALJ's findings are supported by substantial evidence in the record, and we therefore accept them as, in such event, we must. 29 U.S.C. § 160(f).

Classic Industries, Inc., is a Pennsylvania corporation with its principal offices in Latrobe, Pennsylvania.[2] The company makes and sells custom plastic moldings and employs some 50–60 employees in production and maintenance work. Most of the relevant events took place in the Latrobe plant, which was non-unionized during the spring and summer of 1978.

In late March or early April of 1978, the International Association of Machinists and Aerospace Workers ("the Union") began organizing activities at the Latrobe plant.[3] At an employee meeting held at about this time or soon thereafter, the vice-president and co-founder of Classic, Joe Policastro, reportedly said that he had "heard rumors about a union being started" and that he was opposed to such a development, prefer-

ring, he said, to work with the employees directly rather than with "outsiders."[4]

On April 11 or 12, foreman John Huston, whom the ALJ found, with record support, to be acting in this regard as an agent of the Company, distributed ballots during work hours to the employees working under him. These ballots listed the names of everyone on the shift. Huston instructed the employees to check the names of two co-workers and explained that the two receiving the most votes would be representatives on a new employee committee. Other employees in the plant received similar ballots. This process was repeated the next day after it was discovered that some of the ballots were missing names. The record is uncontradicted that Policastro instructed his secretary to draw up, type and copy both the original and the corrected ballots and that he initiated their actual distribution.[5]

One or two days after the election, foreman Huston asked employee Laura Stewart to leave her machine during her regular working time and go upstairs to the Company's conference room to help count the ballots. There she joined another employee, Policastro's secretary and Policastro himself and proceeded to tally the vote. Policastro did not actually count ballots, but he stated that he was in the conference room for about half an hour while the 50–60 ballots were counted. The election resulted in em-

---

2. Classic has alleged and the Board admits in its brief that Classic "does business" within this circuit. Jurisdiction in this court is therefore proper. 29 U.S.C. § 160(f).

3. There is evidence that employee Laura Stewart contacted the Union and that the first organizing meeting took place at her house. At that meeting she and a number of other employees signed Union authorization cards. This was around the beginning of April. The Union was meeting with employees in April and May, but did not communicate with management until the end of May.

4. Mr. Policastro denied having said this then. He testified that the first time he knew the Union was organizing his plant was on May 30, 1978, when he received a letter from the Union claiming majority status and demanding recognition. The ALJ did not credit Policastro's testimony in this regard, crediting instead the con-

flicting testimony of an employee. We have read the entire record and considered the Company's various arguments against acceptance of the ALJ's credibility determination. We conclude that the ALJ's choice is supported and not unreasonable; it must therefore stand. *NLRB v. Pearl Bookbinding Co.*, 517 F.2d 1108, 1112 (1st Cir. 1975).

5. Policastro testified that he performed these services at the behest of several employees. Classic failed to produce a single employee witness who would corroborate this important point, however. We think the ALJ was justified in drawing a negative inference, as he expressly did, from this absence of corroboration, and could reasonably conclude, on all the evidence, that Policastro acted on his own initiative. *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595, 601–02 (1st Cir. 1979).

ployees Stewart, Giesey, Keefe, Nicholson, Poole, Pratt, and Rudy being ,made the members of what came to be known as the Shop Committee. Four other employees were designated as alternates.

The Shop Committee met on six occasions between the election and June 9. It never met on its own initiative, but rather each meeting was apparently called by Policastro. Vice-president Policastro was present at every meeting, and he opened, closed and guided the discussion at most, if not all of them. He continued to meet and discuss various employee grievances with the Shop Committee even after he had received formal notice from the Union that they claimed to represent a majority of his employees. At the penultimate meeting on June 8, he urged the Shop Committee to intervene in the upcoming representation election and passed out typed ballots, produced prior to the meeting by the Company, which listed the names of all 11 Shop Committee members and alternates. He also offered the use of the Company lawyer if the Shop Committee decided to intervene.

Not surprisingly,[6] the Shop Committee balked at this suggestion and requested a day to poll their constituents. The next day they returned and voted 7–4 against intervening in the Union election. There is testimony that Policastro looked "really rejected" when the Shop Committee informed him of the result and that Policastro sought to speak with the four dissenting members of the Committee immediately after the vote, though in his testimony he denied this.

This vote marked the end of the Shop Committee as it was originally constituted. With Policastro's assistance and encouragement, however, the Shop Committee was resurrected around a nucleus of Rosemary Poole, a pro-intervention member of the original Shop Committee, and Kathy

Amond, one of Poole's co-workers in the inspection department. When Poole asked Policastro what could be done to counter the Union, Policastro encouraged Poole to find out how the Shop Committee could get on the NLRB ballot,[7] allowed her to make long distance calls at Company expense to get this information, and prodded her to follow up on her first inquiries. These efforts eventually resulted in the Shop Committee's being included on the ballot for the July 20 representational election.

During the period between the dissolution of the original Shop Committee and the election on July 20, several events took place which the Board found to be violations of section 8(a)(1) and which tainted the election. These incidents also support the Board's finding that the Shop Committee was illegally dominated.

First, Policastro campaigned actively for the Shop Committee and against the Union. The ALJ found, with record support, that Policastro stated that the Company "would go bankrupt" if the Union were elected, that layoffs might result, and that another closely related company had suffered a shutdown due to high union wages. He also stated, falsely it could be found, that the Union would charge a $100 initiation fee for each employee if it won the election. At the same time, he said that the Shop Committee could use the Company lawyer if it won, reiterated his preference for working with the employees directly rather than with "outsiders," and granted Rosemary Poole permission to speak to the workers in the plant on behalf of the Shop Committee during her working time.

During this period, Policastro discriminated in favor of the Shop Committee in matters regarding employee discipline and grievances. On July 5, Policastro issued a warning slip to Laura Stewart for defective

6. At least one of the Shop Committee members—notably Laura Stewart—was a Union activist. The results of the vote on the intervention question also suggests that a majority of the Shop Committee favored the Union at this time.

7. The evidence showed that Poole was active in resurrecting the Shop Committee as well as Policastro. The record as a whole supports the conclusion, however, that the two worked very closely together in all phases of the job and that Policastro initiated actions and ideas on behalf of the Shop Committee when Poole did not. He also supported every action she took.

work and misconduct. Both Poole and Amond (the only active members of the Shop Committee) were present at the meeting where this occurred; they were shown material from Stewart's personnel file; and they were permitted to act in a mediating role both before and during this incident. There was testimony that Policastro even introduced Poole and Amond as being involved in the Stewart matter on behalf of the Shop Committee.

The election which followed all these events was close. The initial tally disclosed 24 employees for the Shop Committee and 24 for the Union. Four ballots were contested. After investigation, the final vote came to 28–24 in favor of the Shop Committee. Shortly after the election, Policastro suggested to Poole that she tell the employees the Shop Committee was active. With Policastro's permission and encouragement, she posted a notice to that effect on the Company bulletin board.

On January 19, 1979, the regional director of the Board notified Classic that he was withholding certification of the Shop Committee pending a final determination of an alleged section 8(a)(2) complaint filed by the Union. Notwithstanding, Policastro proceeded to negotiate and sign a rather comprehensive collective bargaining agreement with the Shop Committee which recognized the Shop Committee as the "sole bargaining agency" for all production and maintenance workers at the plant. This agreement took effect on April 16, 1979— only two weeks before the hearing on the section 8(a)(2) charge in this case took place. At no time during the period at issue here, however—either before or after the July 20 election, and continuing through the hearing in this case—did the Shop Committee have a constitution, bylaws, rules, elected officers, a dues system, or any formal structure whatever. Indeed, as of May 3, 1979, the Shop Committee had never received funds from any source.

■ We think the ALJ and Board were entitled to infer from the foregoing that the Shop Committee was illegally dominated. True, when the resurrected Shop Committee came to negotiate the collective bargaining agreement, it appears to have stood up to the Company and won some concessions. But this enhanced activity took place in the shadow of a serious unfair labor practice proceeding, when it was in the Company's interest to make it appear that the Shop Committee was genuinely independent. In these circumstances we do not believe the Board had to treat the semblance of arm's length bargaining as truly indicative that the Shop Committee was free from employer influence.

We therefore have little hesitation in holding that this record supports the Board's conclusion that the Shop Committee was an illegally dominated labor organization. The record fairly supports the conclusion that Policastro initiated the Shop Committee as an in-house labor organization, the purpose of which was to head off a union-organizing drive. He opened, closed and generally directed the Shop Committee meetings. He thereafter encouraged its growth and success by affording it material support and by discriminating in its favor during the election contest with the rival Union. He negotiated with the Shop Committee after the election while on notice that certification was in doubt. Finally, throughout the entire period at issue here, the allegedly independent Shop Committee had none of the indicia of independence (such as bylaws, rules for electing members, dues, a constitution, or independent sources of income) which mark truly autonomous organizations. The caselaw indicates that such a factual pattern denotes more than mere support; it warrants a finding of actual domination. *NLRB v. Clapper's Manufacturing, Inc.*, 458 F.2d 414, 418 (3d Cir. 1972); *NLRB v. Reed Rolled Thread Die Co.*, 432 F.2d 70 (1st Cir. 1970); *NLRB v. Dennison Manufacturing Co.*, 419 F.2d 1080 (1st Cir. 1969).

■ Our decision in *NLRB v. Northeastern University*, 601 F.2d 1208 (1st Cir. 1979), to which Classic repeatedly refers, does not require a different result. In *Northeastern University* we reversed a Board finding of domination on the grounds that there was

no evidence the employer had "actually" dominated a well-established university labor group which the ALJ had found to be an "effective" labor organization. Here there was substantial evidence of actual domination, and no finding, or evidence that would require a finding, of effectiveness. It is true that, in a given case, elements of domination such as assistance in election procedures, limited use of Company resources, and even the fact that the employer encourages establishment of the organization in the first instance, "does not a domination case make," *id.*, at 1214. But when, as here, all these factors and more are found in a single case, the Board may properly find domination. *NLRB v. Vernitron Electrical Components, Inc.*, 548 F.2d 24, 26 (1st Cir. 1977).

We have considered all of Classic's other factual and legal arguments and find them to be without merit.

*The order of the Board will be enforced. The petition for review is denied.*