NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HOMEMAKER SHOPS, INC.,
Respondent.

No. 82–1646.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1983.

Decided Jan. 6, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Abby Simms (argued), Detroit, Mich., for petitioner.

Lawrence J. Breskin (argued), Breskin & Gunsberg, Detroit, Mich., for respondent.

Before KENNEDY and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

The National Labor Relations Board has applied to this Court for enforcement of its order finding that Respondent, Homemaker Shops, Inc. (Company), violated Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) by interrogating its employees about their union activities and by creating the impression among employees that their union activities were under surveillance. The Board further found that the Company violated Section 8(a)(2) and (1) of the Act (29 U.S.C. § 158(a)(2) and (1)) by dominating, assisting, supporting and interfering with the operation and administration of the Homemaker Shops Representative Committee (Committee), a labor organization.

The Board ordered the Company to cease and desist from the unfair labor practices found, and from interfering with, restraining, or coercing employees in the exercise of their Section 7 rights in any labor-related manner. Affirmatively, the order required the Company to withdraw all recognition from the Committee as the representative of its employees in the bargaining unit, to disestablish the Committee as representative, and to post an appropriate remedial notice. 261 N.L.R.B. 441 (1982).

We deny enforcement of the affirmative order and enforce only one of the unfair labor practice orders, for the reasons hereinafter set forth.

This cause arose from an unfair labor practice charge filed by the Retail Store Employees Union, Local 876, United Food and Commercial Workers International Union, AFL–CIO–CLC, with the Board, on November 26, 1979. A complaint was issued by the General Counsel for the Board on January 31, 1980, and subsequently amended on August 12, 1980, and the matter was heard by a Board Administrative Law Judge (ALJ) on September 2, 1980. The ALJ dismissed the complaint but the Board, while essentially adopting the ALJ's factual findings, reached different legal conclusions.

## I.

The Company operates a chain of 32 retail stores selling linens and related household goods in Michigan, Ohio, Kentucky, Indiana and Pennsylvania. Its principal office and corporate headquarters are located in Lathrup Village, Michigan.

On October 22, 1976, following a Board-supervised election, the National Labor Relations Board certified the Committee as the bargaining representative for the Company's non-managerial employees in a bargaining unit consisting of 16 stores in Michigan.[1] No evidence was presented in this case regarding the origins of the Committee; but three employee representatives sought recognition of the Committee as the bargaining representative for the Group I stores, and the Company then conditioned such recognition on a majority vote of the Group I employees in a Board-supervised election, and subsequent Board certification of the Committee. (Joint Exhibit 7a).

The Committee consists of one employee representative from each of the Company's 32 stores, elected each May for a one-year term by secret ballot of the non-managerial employees in the store. The employee, in each store, who receives the second-highest number of votes is thereby chosen to serve as alternate representative. The foregoing details of Committee structure and electoral procedure have been contained in the collective bargaining agreements negotiated by the Committee with the Company. (Joint Exhibits 2, 3, and 4).

According to the Company's policy (Joint Exhibit 9), the balloting for store representatives is to be conducted by the current representative, or the alternate, or the most-senior employee present, but the practice has been for the Company to supply the ballots, for the store manager to announce the time of such elections and their results,

---

1. This unit of stores is referred to as "Group I" by the Company. Groups II and III, consisting of eight stores each, are not involved in these proceedings, although the Committee does in fact contain representatives from, and represents the employees of, these other two Groups.

for the ballot box to be placed at or near the manager's desk, and for the manager or assistant manager to take part in tallying the results. No evidence was presented to show interference by management in the employees' choice of representatives to the Committee, though management officials reportedly vetoed, on two occasions, suggested changes in the term of office and electoral system for Committee members.[2]

The Committee is an unincorporated entity, and has, apart from the collective bargaining agreement, no constitution, bylaws, or other governing instrument. No dues are charged by the Committee, and it maintains no permanent administrative structure (e.g., officers, secretarial staff) between meetings. The Committee meets annually in the fall, and occasionally has had special meetings.[3] All meetings are scheduled by the Company, with notices sent out to the store representatives by the Company's president, but the representatives are often polled in advance as to suitable dates for such meetings.

Committee meetings usually take place in two stages: (1) a private meeting among the store representatives; and (2) a meeting, held later the same day or on the following day, between the Committee and top management officials (the Company's president, vice-president, and general counsel). At the earlier meeting, held in a room at the Company's main office where chairs and coffee are provided by the Company, the store representatives, meeting alone, compile grievances, demands, and other proposals for presentation to management, and elect a negotiating committee of three to five Committee members [4] to act as spokespersons at the later meeting with manage-

ment. In the subsequent meeting, the participants discuss the Committee's presentation of grievances, demands, and proposals, and also new store merchandise and sales policies. The store representatives are compensated by the Company for travel expenses, and for any lost work time, incurred as a result of attending these meetings between the Committee and management. Although no meetings of the store representatives have been held, other than those scheduled by the Company in conjunction with meetings between the Committee and management officials, the collective bargaining agreements have recognized the possibility of additional meetings, providing that the Committee negotiators could have "time off, without pay, for purposes of attending union meetings not more frequently than once each six months." (Appendix at 192).

At the time the Board's order was issued in this case, the Committee and management had negotiated and signed two collective bargaining agreements, covering the periods of January 2, 1977, through January 2, 1980, and January 2, 1980, through January 2, 1983, respectively. The negotiations for the latter agreement took place within the six-month period prior to the filing of the unfair labor practice charge, and are thus within the scope of this proceeding. 29 U.S.C. § 160(b) (1976).

There is little evidence that the Committee negotiators engaged in "hard" bargaining with management. The 1979 negotiations were later described by the Group I negotiator as follows: "Basically, we just asked for what we wanted, if it was possible. It was discussed, and if not, it was

---

2. On one occasion, it was suggested to the Company's president, at one of the annual meetings, that the store representatives should be chosen for a two-year term. On the other occasion, it was suggested to one store manager, at the time of the yearly election, that a separate ballot should be held for the alternates. Both times, the management official refused to agree to the change; however, both incidents took place while a collective bargaining agreement, governing these matters, was still in force, and neither suggestion was made during contract negotiations.

3. The record evidenced two such special meetings: one, in October 1976, to negotiate the first collective bargaining agreement; and the second, in late November 1979, to discuss the representation petition and unfair labor practice charge recently filed with the Board.

4. The contract specifies three representatives from Group I, and one each from Groups II and III, but the 1979 committee only included one representative from Group I.

usually no, and the reason why we couldn't have it." (Transcript at 26). However, the Committee was largely successful in obtaining management agreement to its proposals, at least in a compromise form, and both contracts mentioned in the record of this case were subsequently ratified by the employees. The 1980–83 contract included a ten-percent wage increase, an increase in employee life insurance from $2,000 to $5,000 over three years, an automatic cost-of-living increase provision, a dental insurance plan, bonuses for cashiers, and such benefits as funeral leave, increased weekends off for full-time employees, and random days off for perfect employee attendance. Most, if not all of these items, were included in response to Committee proposals. Those requests which were rejected by Company negotiators were characterized by the Group I Committee negotiator as "[l]ittle things, birthdays off." (Transcript at 37).

Another provision of these collective bargaining agreements is a four-step grievance procedure in which the employee's store representative or the Committee's negotiators are involved in all stages but the employee's initial complaint to the store manager. Although the store representatives who testified before the ALJ in this case had few recollections of grievance handling, one former representative testified, and another agreed, that there were few problems in the stores necessitating the filing of grievances. (Transcript at 39, 68–69). The latter representative could also recall no instance when management refused to listen to a grievance or problem presented by her. (Transcript at 68). Under the contracts, the store representatives are guaranteed compensation for work-time lost during grievance handling. (Appendix at 25).

## II.

The events giving rise to these proceedings began with a challenge to the Committee's representative status by Local 876 of the Retail Store Employees Union. That other union filed a petition with the Board on November 2, 1979, seeking a representation election at nine Detroit-area stores within the 16-store bargaining unit. Later in the same month, that union filed a charge with the Board, alleging that the Company had dominated and interfered with the Committee, and had provided it with financial and other support.

On November 30, 1979, a special meeting of the Group I store representatives was called, at which the Company's president, vice-president and attorneys discussed with the representatives the nature of the representation petition and unfair labor charge, and advised them that they could hire their own attorney or contact the Company's general counsel if they had any legal concerns.

On January 31, 1980, the Board's General Counsel issued a complaint charging the Company with unlawful interrogation of employees, and with rendering unlawful aid, assistance and support to the Committee. (Appendix at 4–8). Subsequently, on August 12, 1980, an amended complaint specified one occasion when John Laughead, manager of the Company's Roseville store, interrogated employees about their union activities and those of other employees, and another occasion when Ronald Chene, manager of the Taylor store, "harasseed [the Company's] employees by watching their actions at work with the expressed intent of reporting Union activities to higher management." (Appendix at 20–23). The complaint, as amended, sought, as remedy for the unlawful assistance, an order that the Company cease recognition of the Committee until an election could be held. On August 29, 1980, counsel for the Board's General Counsel informed the Company's attorney that he intended to seek further amendment of the complaint, at the forthcoming hearing, to include an allegation of interrogation at the Briarwood store by the store manager.

Three days later, on September 2, 1980, the hearing was held before Administrative Law Judge William Gershuny. At the outset, the Board counsel, in response to the ALJ's request for a "precise opening statement indicating the scope of [the General

Counsel's] case and relief [sought]," made the following statement:

> Our relief is that we wish the employer to cease recognizing the Committee for the Group 1 stores until such time as it is certified by the Board in another election. The rest of our relief is spelled out in the complaint. Basically our allegation is that the employer has unlawfully assisted this Group 1 representative Committee and therefore, leads to the remedy spelled out in the complaint.

(Transcript at 14).

At this hearing, Kathleen Kelly, a former employee at the Briarwood store and Committee member in 1979, testified that on November 1, 1979, her store manager, Kenneth Himes, had asked her if she had met that day with a representative of the other union (she had in fact done so prior to coming to work), and asked about what kinds of demands the other union was going to make. According to her testimony, this latter inquiry was prefaced by a telephone call between Himes and his supervisor, made within earshot of Ms. Kelly, in which the manager reported Ms. Kelly's meeting with the union representative, and asked if the supervisor wanted him to ask her anything about it. After Ms. Kelly answered the manager's second inquiry in vague terms about wage and health insurance demands, Himes allegedly again phoned his supervisor to report.

Soon after this line of questioning began, the Company's counsel objected on grounds that the complaint, as previously amended, contained no allegation of this episode, and pointed out that the Board's investigators had received Ms. Kelly's affidavit concerning these matters in December 1979. Counsel for the General Counsel then moved to amend the complaint again, but the ALJ, reserving his ruling until the direct examination of Ms. Kelly was completed, ultimately denied the motion. He did, however, permit cross and re-direct examination of Ms. Kelly, and direct and cross-examination of Mr. Himes, in order to establish a record concerning that incident in case the Board overruled his denial of the motion to amend. On the witness stand, Himes recalled the conversation only in general terms, remembering that he was "[b]asically just asking if there was anything, if there was any Union activity going on," (Transcript at 83), and that he later called his supervisor at the latter's request.

Another former employee and Committee member, Barbara Brown, testified that one day in early January 1980, she was talking to her husband on the store telephone and noticed that her store manager, Ronald Chene, stood approximately a foot and a half away from her throughout the phone conversation, apparently monitoring what was said. When she reportedly commented, jokingly, about Chene's "babysitting" her, the manager replied, in a quasi-joking manner, that the Company president had instructed him to monitor her phone calls for conversations with or concerning the outside union, and to report back if any took place. Called to the stand, Chene conceded that it was "very possible" that such a conversation took place between him and Mrs. Brown, but that he could not recall the exact words used.

Janet Gingrich, then employed by the Company and serving as a store representative, testified that, sometime in early 1980 (she was unable to recall the day or month), her store manager, John Laughead, asked if she knew where the outside union activity was originating. Mrs. Gingrich said she responded by saying that she did not have any idea and would not tell Laughead even if she did. The manager later testified that the conversation never took place.

On November 7, 1980, the ALJ dismissed the amended complaint, finding the assistance offered by the Company to the Committee to be in the nature of appropriate cooperation between management and labor, and not undermining of or threatening to the Committee's independence. Although he refused to make findings regarding the alleged interrogation of Kathleen Kelly, the ALJ found that the incidents involving Mrs. Brown and Mrs. Gingrich were harmless and not coercive or intimidating, even crediting their testimony.

Judge Gershuny also specifically noted that "[t]here is no evidence of domination, actual or potential, of any Committee function and, indeed, the complaint does not allege and counsel for the General Counsel does not contend that the Committee is the victim of employer domination." (Appendix at 217).

Counsel for the General Counsel filed exceptions to the ALJ decision, asserting for the first time that the Company was dominating the Committee. The Company's counsel argued, in his opposing brief, that the General Counsel's change in position would deprive the Company of proper notice and due process of law. A three-member panel of the Board, however, determined that the complaint allegations of unlawful assistance were sufficient to bring the issue of domination within the scope of the complaint, and went on to find that the Company "has provided assistance and support to the Homemaker Shops Representative Committee, and has dominated the administration of the Committee, in violation of Section 8(a)(2) and (1) of the Act." 261 N.L.R.B. at 443.

The Board further granted the General Counsel's motion to amend the complaint to include an allegation of the Himes-Kelly interrogation, finding that the allegation was fully litigated at the hearing and was closely related to the other allegations in the complaint. Reversing the ALJ's conclusions to the contrary, the Board determined that the incidents involving Ms. Kelly and Mrs. Gingrich constituted unlawful interrogation, and that store manager Chene created the unlawful impression of surveillance of Mrs. Brown's union activities. The Board's order is now before this Court for review.

### III.

We turn first to the Board's finding that the Company has acted in such a way as to dominate the operation of the Committee. The key issue is whether the Board can properly make such a finding when the complaint, and the General Counsel at hearing, only alleged that the Company had unlawfully provided financial and other assistance. We hold that it cannot do so.

"The office of the complaint issued by the Board is to 'notify the adverse party of the claims that are to be adjudicated so that he may prepare his case, and to set a standard of relevance which shall govern the proceedings at the hearing.'" *N.L.R.B. v. Johnson,* 322 F.2d 216, 219 (6th Cir.1963) (quoting *Douds v. International Longshoremen's Ass'n,* 241 F.2d 278, 283 (2d Cir. 1957)), *cert. denied,* 376 U.S. 951, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964). Paragraph 12 of the amended complaint, issued three weeks prior to the administrative hearing in this case, alleged:

12. Since on or about May 26, 1979, and continuing to date, Respondent has rendered and is rendering unlawful aid, assistance and support to the Homemaker Shops Representative Committee by scheduling and controlling the election of Committee representatives; by calling, attending and directing meetings of Committee representatives, and compensating representatives to attend these meetings; and by providing financial assistance to the Committee by offering legal assistance and by allowing the Committee to use its officers, equipment, facilities, and supplies to conduct Committee business.

(Appendix at 22). At the hearing the General Counsel's attorney said that [b]asically our allegation is that the employer has unlawfully assisted this ... Committee." (Transcript at 14). Company counsel also asserted at oral argument that, during an off-the-record conversation at hearing between counsel and the ALJ, the General Counsel's attorney affirmatively stated that a finding of domination was *not* being sought. Therefore, the Company clearly received no notice, either before or during the administrative hearing, to alert counsel that the broader, and remedially more severe,[5] charge of domination was to be litigated.

---

5. The Board follows a policy, supported by decisions of this Court, of ordering the total dises-

tablishment of unions found to be employer-dominated, but of only ordering derecognition,

■ The Board's decision noted that "the difference between unlawful assistance and unlawful domination is one of degree." 261 N.L.R.B. at 442. We agree that the evils of support and domination fall within the same spectrum or continuum of unfair labor practices prohibited by Section 8(a)(2) of the Labor Act.[6] *See Fremont Manufacturing Co.,* 224 N.L.R.B. 597 (1976), *enforced,* 558 F.2d 889 (8th Cir.1977). However, this is not to say that the two concepts are synonymous, or that proof of one is necessarily proof of the other in all cases. The Board also stated, in its decision, that

> where a material issue of unlawful conduct related to the subject matter of the complaint has been fully litigated and the facts necessary to decide the question have been adduced without objection by Respondent, the Board is not precluded from deciding the issues, regardless of whether it has been specifically pleaded.

261 N.L.R.B. at 442 n. 5. The question, then, is whether the issue of domination was fully and fairly litigated in the administrative hearing, irrespective of the General Counsel's failure to raise that issue. *See N.L.R.B. v. Complas Industries, Inc.,* 714 F.2d 729, 733 (7th Cir.1983); *Marlene Industries Corp. v. N.L.R.B.,* 712 F.2d 1011, 1018 n. 9 (6th Cir.1983); *S.S. Kresge v. N.L.R.B.,* 416 F.2d 1225, 1234–35 (6th Cir.1969); *N.L.R.B. v. Johnson,* 322 F.2d at 220.

Among the factors considered important by the Board, in reaching its finding of domination, were the purported lack of arm's length bargaining between the Committee and the Company, and the allegedly minimal amount of grievance handling by the store representatives.[7] It is the Board's reliance on these factors which illustrates the deficiencies of the record established at hearing. For example, only one store representative, Brenda Harris, testified with respect to how collective bargaining negotiations were conducted, in 1979, between the Company and the Committee. Although there were other participants in those negotiations, including the Company's high management officials, Company counsel, presumably relying on the General Counsel's failure to allege domination, or to make any specific allegation concerning those negotiations, did not present other accounts of how those negotiations were conducted. The testimony of one out of at least six participants in such an important event is indeed a slender reed on which to support a conclusion that the parties did not bargain at arm's length, even accepting the Board's interpretation of Ms. Harris' testimony.

Likewise, the testimony at hearing regarding the degree of grievance handling

pending an election and certification, of unions found to have been unlawfully assisted or supported by the employer. *Carpenter Steel Co.,* 76 N.L.R.B. 670 (1948). *See also N.L.R.B. v. Metropolitan Alloys Corp.,* 624 F.2d 743, 745 (6th Cir.1980); *N.L.R.B. v. Chardon Telephone Co.,* 323 F.2d 563, 564 (6th Cir.1963).

**6.** Section 8(a)(2), 29 U.S.C. § 158(a)(2) (1976), makes it "an unfair labor practice for an employer ... to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it."

**7.** In finding unlawful assistance and domination, we rely on the collective import of the following factors: (1) The Committee has no charter, bylaws, or governing rules, no regular officers, and no provision for the payment of dues. (2) The only body of rules governing the operation of the Committee is contained in the bargaining agreement between Respondent and the Committee. (3) Respondent exercises sole authority to schedule annual and special meetings with the Committee and the Committee's representatives only meet prior to these scheduled meetings with Respondent. (4) Respondent plays a substantial role in determining and overseeing the Committee's internal election procedures. (5) The most recent contract negotiations were not characterized by arm's-length bargaining. Respondent summarily accepted, rejected, or compromised the Committee's requests, without further counterproposals. (6) There is minimal evidence of grievance handling by the Committee. (7) The Committee's representatives are paid their regular hourly wages plus travel expenses for their participation in all Committee functions. (8) Respondent provides free temporary facilities and coffee for the Committee's pre-negotiation meetings. (9) Respondent offered the Committee the services of its attorney on November 30, 1979.
261 N.L.R.B. at 442–43.

by store representatives was extremely limited. The General Counsel only called as witnesses five past or present store representatives from four out of the 16 Company stores in Group I. Company counsel, again apparently relying on the absence of any allegation in the complaint regarding grievance handling, did not call any other representatives from any of the other stores to testify about their experience with employee grievances and management's handling thereof. What testimony there was painted not a picture of a work place where the grievances of employees were ignored, and the store representatives played no role in seeking redress, but rather one in which employee-management disputes were comparatively rare and whatever problems did arise were usually resolved when the store representative brought the matter to management's attention. However, the experience of only four out of 16 stores in the bargaining unit is not necessarily indicative of the overall pattern of grievance handling in Company stores, leaving this Court with the view that the matter was not explored to the extent necessary for the Board to reach a finding on the issue. Certainly, the "minimal evidence of grievance handling" is due at least in part to the lack of notice, to Company counsel, that this would form part of the General Counsel's case.

■ In the more general sense, the domination issue was not properly litigated in view of the amended complaint's allegations of only certain types of unlawful assistance or support. Unlike the complaint in *Fremont Manufacturing Co., supra,* where the unlawful assistance alleged (urging and soliciting employees to set up the labor organization in question) was nearly tantamount to domination, the General Counsel here did not, before or during the hearing, make any

sweeping allegation or present any evidence that the Committee had been effectively created by the Company. The fact that the hearing record is so unclear as to the Committee's origins highlights its insufficiency. Although a showing that the Company actually set up the Committee as a labor organization might not be a prerequisite to a finding of domination, the General Counsel's failure to allege broader examples of support which would put in issue the larger question of the Company's role in all of the Committee's functions, and not just certain instances of the Company's involvement in the scheduling of Committee meetings, the holding of Committee elections, the payment of wages and travel expenses for those attending Committee meetings, and the provision of coffee and a meeting place for the Committee meetings, prevented a full and fair litigation of the issue. The fundamental fairness inherent in administrative due process cannot permit the General Counsel to plead a certain charge, insist at hearing that only that charge is being litigated, and then raise a related, but more onerous charge only after the hearing record is closed.[8] *See Boyle's Famous Corned Beef Co. v. N.L.R.B.,* 400 F.2d 154, 163–64 (8th Cir.1968); *N.L.R.B. v. Majestic Weaving Co.,* 355 F.2d 854, 861 (2d Cir.1966).

### IV.

■ We need not rest our disposition of the domination issue solely on the lack of proper notice, for our examination of the record shows that the Board's findings of unlawful domination and assistance are not supported by substantial evidence. It is true, of course, that the Board's findings of fact, "if supported by substantial evidence on the record considered as a whole," are conclusive before this Court. 29 U.S.C.

**8.** Counsel for the Board argues the Company should be precluded from objecting before this Court, on due process grounds, to the Board's finding of domination since it did not petition the Board for reconsideration under 29 C.F.R. § 102.48(d)(1) (1982). Although this Court could not consider any objection not urged before the Board, 29 U.S.C. § 160(e) (1976); *see also International Ladies' Garment Workers' Union v. Quality Manufacturing Co.,* 420 U.S.

276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975); *Larand Leisurelies, Inc. v. N.L.R.B.,* 523 F.2d 814, 819–20 (6th Cir.1975), the Company clearly objected, before the Board, to the General Counsel's raising of the domination question after the administrative hearing. (Respondent's Brief in Opposition to General Counsel's Exceptions to the Administrative Law Judge's Decision, at 6–7). This Court may therefore consider the due process argument.

§ 160(e) (1976). *See also Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). However, where (as in the case at bar) there is disagreement between the Board and its ALJ, the substantial nature of the evidence supporting the Board's findings is further called into question, and the reviewing court must examine the record with greater care. *Larand Leisurelies, Inc. v. N.L.R.B.,* 523 F.2d at 820. This is so even when the Board does not disagree with the ALJ's factual findings, as such, but draws different inferences from those facts. *N.L.R.B. v. Tru-Line Metal Products Co.,* 324 F.2d 614, 615 (6th Cir. 1963), *cert. denied,* 377 U.S. 906, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964).

■ "The Board must prove that the employer's assistance is actually creating Company control over the Union before it has established a violation of Section 8(a)(2)." *Modern Plastics Corp. v. N.L.R.B.,* 379 F.2d 201, 204 (6th Cir.1967). Not all cooperation and assistance between management and a union is proscribed by the Labor Act. The test of whether there is unlawful domination or assistance by the employer is a subjective one, turning on whether the employees are in fact being deprived of their freedom of choice. *N.L.R.B. v. Keller Ladders Southern, Inc.,* 405 F.2d 663, 667 (5th Cir. 1968); *Federal-Mogul Corp. v. N.L.R.B.,* 394 F.2d 915, 918 (6th Cir.1968); *Coppus Engineering Corp. v. N.L.R.B.,* 240 F.2d 564, 571–73 (1st Cir.1957); *Chicago Rawhide Manufacturing Co. v. N.L.R.B.,* 221 F.2d 165, 168 (7th Cir.1955); *N.L.R.B. v. Sharples Chemicals, Inc.,* 209 F.2d 645, 652 (6th Cir. 1954). "[R]esolution of the issue depends on the facts and circumstances of each particular case." *N.L.R.B. v. H & H Plastics Manufacturing Co.,* 389 F.2d 678, 680 (6th Cir.1968).

■ Turning to the factors cited by the Board in support of its findings of domination and assistance,[9] we consider the fact that the Committee is relatively unstructured, having no governing rules (apart from provisions in the collective bargaining agreements) and no independent financial resources, not to be determinative of the matter. *Federal-Mogul Corp. v. N.L.R.B.,* 394 F.2d at 918. A weak, unaffiliated labor organization is, of course, more susceptible to management interference and control than a union affiliated with a national or international labor organization, but section 10(c) of the Labor Act, 29 U.S.C. § 160(c) (1976), requires that the same rules of decision be applied to affiliated and unaffiliated unions alike. It is not the *potential* for employer control, but rather the *reality* thereof, that is the key element of a true case of unlawful domination or assistance. *Modern Plastics Corp. v. N.L.R.B.,* 379 F.2d at 204.

■ The Board also looks to the Company's role in convening Committee meetings and holding their elections. It is true that the only Committee meetings held have been scheduled by the Company. But this is a far cry from saying that the Company had "sole authority" to convene the Committee or otherwise permit it to function. 261 N.L.R.B. at 443. The contract itself acknowledges that there might be meetings among the three to five Committee negotiators (for which they would be granted unpaid leave from work), apart from the meetings between the Committee and management (for which the Committee members are reimbursed for lost wages). That there have been no separate meetings of the Committee or its negotiators, except for those held immediately prior to each Committee-management meeting, speaks as much about the degree of employee satisfaction as it does about the purported undue weakness of the Committee as a labor organization. No evidence was presented to show that the Company prevented, or even discouraged, additional Committee meetings.

■ Likewise, the degree of Company involvement in store representative elections is demonstrative of the employer's cooperation with the Committee. Employer assistance with union election procedures is not

---

**9.** *See* footnote 7 *supra.*

*per se* unlawful. *N.L.R.B. v. Northeastern University,* 601 F.2d 1208, 1214 (1st Cir. 1979). The question again is whether there is subversion of the employees' freedom of choice. The ballots supplied by the Company carry the names of all store employees in the bargaining unit, and voting is secret. Managers and assistant managers are ineligible to vote, or to serve as store representatives, and no evidence shows that the Company has manipulated the choice of representatives by miscounting the ballots, "stuffing" the ballot boxes, or using its power to transfer disfavored employees. Although management officers expressed opposition to changing the representatives' term of office and the procedure for choosing alternates, these matters were then governed by existing contract provisions. Nothing in the record shows an unsuccessful attempt by the Committee to renegotiate these provisions during new contract negotiations.

Unlike other "in-house" unions found to be dominated by the reviewing courts, *see, e.g., Classic Industries, Inc. v. N.L.R.B.,* 667 F.2d 205, 208 (1st Cir.1981); *N.L.R.B. v. H & H Plastics Manufacturing Co.,* 389 F.2d at 681, the Committee has conducted meetings without any management personnel present. At such meetings, the store representatives were able to freely discuss their grievances and bargaining demands, and to choose whom they wanted as negotiators for the following bargaining session. The only minutes introduced in evidence were of the Committee-management sessions, but nothing in the record shows that the Company exercised any control over what they could present to management in the later sessions.

■ As noted above, the evidence of the collective bargaining sessions themselves is limited. However, Ms. Harris' testimony at hearing indicates not that the Company dictated the contract terms, but rather that management often responded favorably to employee-suggested terms. Whether or not the Committee negotiators were insistent about their demands, or offered counterproposals when management rejected certain terms, shows only the degree of assertiveness of the employee representatives, and not whether the Company forced them to accept only those terms it was willing to include in the contract. The pattern of at least partial acceptance of Committee proposals (drawn up at the Committee's earlier private meetings) demonstrates that the Company has not placed itself "on both sides of the bargaining table." *N.L.R.B. v. Mt. Clemens Metal Products Co.,* 287 F.2d 790, 791 (6th Cir.1961).

■ The Company's reimbursement of the store representatives for work time lost, and travel expenses incurred, due to attendance at the annual meetings with management, is only another example of its desire to maintain a friendly and cooperative relationship with the Committee. The Labor Act specifically provides that "an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." 29 U.S.C. § 158(a)(2) (1976).[10] We find no evidence that the reimbursement for lost wages, or for gas mileage, had any coercive impact on the Committee members. It has been recognized that the payment of travel expenses for employee negotiators engaged in collective bargaining with management can, and should properly, be the subject of negotiation between labor and management. *Bureau of Alcohol, Tobacco and Firearms v. F.L.R.A.,* —— U.S. ——, ——, n. 17, 104 S.Ct. 439, 449 n. 17, 78 L.Ed.2d 195 (1983). Since the contracts between the Company and the Committee have not provided for such reimbursement for Committee meetings not connected with union-management bargaining sessions, and no such other meetings have taken place, we have no occasion to address the question of whether reimbursement in that context would be permissible.

---

10. The record is unclear as to whether the reimbursement for lost wages applied only to the Committee-management meeting phase of the annual meetings, but one former store representative testified that she was not paid her wages for attendance at meetings held when she (who was then working part-time) was not scheduled to work at the store.

■ Likewise, the mere providing of coffee and a meeting room for the Committee, standing alone, does not constitute unlawful assistance. *See N.L.R.B. v. Vernitron Electrical Components, Inc.,* 548 F.2d 24, 26 (1st Cir.1977). As the court in *Hertzka & Knowles v. N.L.R.B.,* 503 F.2d 625, 630 (9th Cir.1974), *cert. denied,* 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975), noted:

> Literally ... almost any form of employer cooperation, however innocuous, could be deemed "support" or "interference." Yet such a myopic view of § 8(a)(2) would undermine its very purpose and the purpose of the Act as a whole—fostering free choice—because it might prevent the establishment of a system the employees desired.

Here, most if not all of the assistance provided by the Company—sending out notices of Committee meetings, providing ballots for elections, and coffee and a room for the meetings, reimbursing travel expenses—helped the Committee, an entity with no supporting administrative or financial structure, to function, if it were to function at all.[11] Company employees in the Group I stores chose this form of representation in 1976 and, apart from whatever dissatisfaction is evidenced by the 30-percent employee support for the outside union at nine of the sixteen Group I stores, there is no strong indication that the Company's employees desire a more structured union to represent them. So long as there is effective representation of employee interests by the Committee—which the record does not substantially dispute—peaceful cooperation between the Company and the Committee should be encouraged, not chastised.[12]

■ Particularly where, as here, the outside union has brought an unfair labor practice charge, seeking to displace an existing union at the same time as it seeks to become the bargaining representative for the same employees, the reviewing court must carefully scrutinize the evidence. *Modern Plastics Corp. v. N.L.R.B.,* 379 F.2d at 204. For us to enforce the Board's order to disestablish the Committee, or even to cease recognition for all purposes pending a new election, would be to take away the employees' freedom of choice much more surely than by anything management has done. Absent a showing that the Company has actually coerced or restrained the Committee from effectively representing the interests of the Group I employees, this Court will not overturn the results of the 1976 representation election before a new election has been held. We therefore find that the affirmative order of the Board is not supported by substantial evidence and is clearly erroneous.

## V.

We turn next to the Board's findings of unlawful interrogation and unlawful surveillance concerning employees' union activities. Before reaching the merits of those allegations, we must first consider the manner in which one of the interrogation charges was litigated before the Board.

## A.

As we have already seen, the General Counsel attempted, at hearing, to amend the complaint to include an allegation that Kenneth Himes, one of the Company's store

---

**11.** The Board also points to the Company's offer of the legal services of the corporate general counsel at the November 30, 1979, special meeting as an example of unlawful assistance. Although such an offer, if accepted, might have put management in too great a position to control Committee action, there is no evidence in the record to show that the offer was, in fact, accepted.

**12.** Whatever value a *per se* prohibition on employer support of unions may have had in early cases arising under the Labor Act, *e.g., Newport News Shipbuilding & Dry Dock Co.,* 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219 (1939), such a rigid rule, requiring a "purely adversarial model of labor relations," *Hertzka & Knowles v. N.L.R.B.,* 503 F.2d at 631, runs contrary to more recent trends—the decline of the notorious "company unions," the change in public policy from nurturing the nascent labor movement to regulating and limiting management and labor excesses alike, and the change in employee attitudes toward employer-employee relations. *See,* Note, *New Standards for Domination and Support Under Section 8(a)(2),* 82 Yale L.J. 510, 515–19 (1973).

managers, unlawfully interrogated an employee in his store, Kathleen Kelly. Company counsel only received notice of this proposed amendment some three to four days before the hearing, although Ms. Kelly had given the Board agent an affidavit, setting forth the basis for the new allegation, nine months earlier in December 1979. Moreover, the complaint had already been amended once, three weeks before the hearing. We agree with Administrative Law Judge Gershuny that to allow this amendment would have been "to encourage the most la[x] legal practices on the part of the General Counsel's office." (Transcript at 59). However, this is just what the Board subsequently did.

█ The Board has, of course, broad authority to amend a complaint at any time prior to issuance of the Board's order, so long as the alleged violation occurred within the six-month period preceding the filing of the original charge. 29 U.S.C. § 160(b) (1976); *N.L.R.B. v. Complas Industries, Inc.,* 714 F.2d at 732–33. Here, the new allegation was uncovered in the course of the Board's investigation of the original unfair labor practice charge, and was similar in nature to the allegation of interrogation contained in the original complaint, and occurred at roughly the same time. *See Eastern Maine Medical Center v. N.L.R.B.,* 658 F.2d 1, 6 (1st Cir.1981). The Board was therefore not precluded from dealing with an unfair labor practice related to those already alleged. *N.L.R.B. v. Fant Milling Co.,* 360 U.S. 301, 309, 79 S.Ct. 1179, 1184, 3 L.Ed.2d 1243 (1959). It is the *manner* in which the Board exercised its authority that we question in this case.

█ Due process requires that a party charged with unlawful conduct be given a "meaningful opportunity to meet the complaint." *N.L.R.B. v. Complas Industries,* 714 F.2d at 733; *see also N.L.R.B. v.*

*Mackay Radio & Telegraph Co.,* 304 U.S. 333, 350, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938); *N.L.R.B. v. Johnson, supra.* Here, Company Counsel had only the period of Labor Day weekend in which to examine and investigate the new allegation, and to locate, interview and secure the attendance of potential witnesses. Counsel for the General Counsel, on the other hand, had had months in which to prepare his case in this matter. Although Himes' supervisor and assistant manager might have had illuminating testimony to give concerning this incident,[13] they did not appear, quite possibly due to the shortness of notice. Under the circumstances, we cannot find that the allegation was fully or fairly litigated at the administrative hearing.[14] Therefore, this Court will not enforce the Board's order with respect to that allegation of interrogation.

### B.

█ To avoid any need to remand for rehearing of the Kelly allegation, and any further delay of the representation election pending for over four years, this Court has examined both of the alleged incidents of unlawful interrogation, and holds that neither incident constituted an unfair labor practice.

█ Questioning or interrogation of employees by the employer is not *per se* unlawful. *N.L.R.B. v. Dale Industries,* 355 F.2d 851, 852–53 (6th Cir.1966). Instead, one must look to all the surrounding circumstances to determine whether the interrogation reasonably tended to interfere with the free exercise of employee rights under the Labor Act. *N.L.R.B. v. Armstrong Circuit, Inc.,* 462 F.2d 355, 357 (6th Cir.1972); *Hughes & Hatcher, Inc. v. N.L.R.B.,* 393 F.2d 557, 563 (6th Cir.1968). "Infrequent, isolated and innocuous inquiries of a relatively small number of employees,

---

13. The supervisor, Mr. Dan Freedland, was the management official with whom Himes allegedly communicated before and after the interrogation of Ms. Kelly. The assistant manager, Mrs. Linda Rathburn, was allegedly present during all or part of the interrogation.

14. Even the examination of the witnesses who *were* called was limited by the ALJ, who warned counsel for the General Counsel, when the latter was about to ask Himes about the incident, "Lets make it brief, otherwise, I will just take a proffer." (Transcript at 83).

standing alone, do not constitute interference, restraint or coercion within the meaning of section 8(a)(1) of the Act." *N.L.R.B. v. Elias Brothers Big Boy, Inc.,* 325 F.2d 360, 364 (6th Cir.1963). *See also N.L.R.B. v. Streamway Division,* 691 F.2d 288, 296 (6th Cir.1982).

Viewed by these standards, neither the alleged interrogation of Kathleen Kelly, nor that of Janet Gingrich, was conduct prohibited by the Act. Accepting for the sake of argument the version told by Ms. Kelly, we can find no statement by Mr. Himes, or other surrounding circumstances, to show that she was subject to either express or implied coercion. Unlike the situation presented in *N.L.R.B. v. Cement Transport, Inc.,* 490 F.2d 1024, 1028 (6th Cir.1974), *cert. denied,* 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974), Ms. Kelly was the only employee questioned by that store manager, and it happened on only one occasion. Neither Ms. Kelly nor any other Company employee was apparently discharged or disciplined for showing interest in the other union. *Cf. N.L.R.B. v. Digital Paging System, Inc.,* 659 F.2d 725, 726 (6th Cir.1981); *N.L.R.B. v. Armstrong Circuit, Inc., supra; N.L.R.B. v. Elias Brothers Big Boy, Inc., supra.* Himes' remarks to Kelly showed no apparent antiunion animus, nor implied any warning of the consequences of supporting the outside union. *Cf. N.L.R.B. v. Franklin Property Co., Inc.,* 617 F.2d 447 (6th Cir.1980), *cert. denied,* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980).

 Likewise, the episode concerning Mrs. Gingrich was, assuming the credibility of her testimony,[15] another isolated incident. There was only a single inquiry by store manager Laughead: "He just asked if I knew anything about any union activity, and what store it might be coming from." (Transcript at 114). There was no implied threat from Mr. Laughead, and no apparent

adverse consequences ensued. Mrs. Gingrich was, at the time of hearing, still employed by the Company.

In both instances, the conduct of the interrogated employee demonstrated a lack of fear or coercion. Ms. Kelly, according to her own testimony, walked into the store on the day in question and made a general announcement to those present that she had just come from meeting with a representative of the outside union. Such is not the behavior of one who wishes to prevent management from knowing about one's union sympathies, or who apprehends the consequences of their being discovered. Mrs. Gingrich's response to manager Laughead's question also evinces a similar lack of fear:

Q. What did you reply to Mr. Laughead?

A. That I didn't have any idea where it came from, *and if I did, I wouldn't tell him.*

(Transcript at 114) (emphasis added).

In view of the isolated and innocuous nature of these incidents, we cannot find that the requisite express or implied coercion existed on which to base a finding of unlawful interrogation under section 8(a)(1) of the Labor Act, 29 U.S.C. § 158(a)(1) (1976). Accordingly, this Court declines to enforce the Board's order with respect to either allegation of interrogation.

### C.

 Finally, we turn to the finding that store manager Ronald Chene unlawfully created the impression that the union activities of employee Barbara Brown were under surveillance. There was substantial evidence presented at hearing to support the Board's finding in this matter.

 Although Company counsel at hearing, and in subsequent argument, has attempted to characterize the whole episode as a joke, we cannot say that there was not

---

**15.** Although Laughead denied the conversation ever took place, the ALJ implicitly, and the Board expressly, credited Mrs. Gingrich's testimony. The credibility assessments of the Board or ALJ are not normally disturbed by this Court. *N.L.R.B. v. Cement Transport, Inc.,* 490 F.2d at 1029 n. 5. We might consider as questionable Mrs. Gingrich's inability to remember even what month the conversation took place—seeing as she testified about it less than a year later—but we need not reach the credibility issue since her testimony failed in any event to establish a violation of the Act.

a sufficient basis for the Board's inference that this was no joking matter. Mrs. Brown testified that "[h]e [Chene] seemed to be" joking around with her when he said the Company president had instructed him to monitor her phone calls for outside union activity, (Transcript at 102), but it also seemed like "he was very serious in what he was saying." (Transcript at 104). There seems to be some ambiguity in Mrs. Brown's account, but all of us are, no doubt, aware that threatening or manipulative statements can, at times, be couched in ostensibly friendly, or even humorous, terms. The threat or manipulation remains nonetheless. The mere existence of friendly relations between a supervisor and an employee does not preclude a finding that the supervisor employed coercion violative of the Act. *Seligman & Associates, Inc. v. N.L.R.B.*, 639 F.2d 307, 309 (6th Cir.1981), *cert. denied*, 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981). Mrs. Brown was effectively put on notice that she was being watched on orders of the highest management official, something the average employee would certainly take as a warning. Such warnings, however, are impermissible under the National Labor Relations Act.

## VI.

In light of the foregoing, this Court enforces the order of the National Labor Relations Board only to the extent that it concludes that the Company, acting through store manager Chene, unlawfully created the impression of surveillance of employee Brown's protected union activity, and that it orders the Company to cease and desist from creating such an impression. In all other aspects, the Board's application for enforcement of its order is denied.