**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARMSTRONG CIRCUIT, INC., Respondent.**

No. 71–1882.

United States Court of Appeals, Sixth Circuit.

June 23, 1972.

Edward N. Bomsey, Washington, D. C., for petitioner; Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail Cooley Baskir, Washington, D. C., on brief.

Merritt W. Green, Toledo, Ohio, for respondent; Russell I. Sturgill, Toledo, Ohio, on brief.

Before WEICK and MILLER, Circuit Judges, and RUBIN,* District Judge.

PER CURIAM.

The National Labor Relations Board petitions for enforcement of its order requiring respondent Armstrong Circuit, Inc., to cease and desist from interfering with, restraining, or coercing its employees in the exercise of their rights

---

* The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation.

under the Act;[1] and affirmatively requiring respondent to offer reinstatement to two discharged employees and to post appropriate notices. Specifically, the Board found that respondent violated Sec. 8(a)(1) of the Act, by unlawfully interrogating employees Durliat, Espen and Earl. Further, the Board found that respondent violated Sec. 8(a)(3) of the Act by discharging Durliat and Earl because of their union activities. After a consideration of the record, we conclude that the order of the Board must be enforced.

Armstrong Circuit, Inc., operates thirteen movie theaters in Northern Ohio. The Cla-Zel is an indoor theater located in Bowling Green, Ohio, and the Portage Drive-In is an outdoor theater located on the outskirts of Bowling Green. In January, 1970, Joseph Espen, a projectionist at Cla-Zel, signed a card authorizing the union to act as his bargaining representative. In February, 1970, John Durliat, a part-time projectionist at Cla-Zel, and Richard Earl, a part-time doorman at Cla-Zel, authorized the union to represent them and applied for union membership. On March 3 the union voted to accept Durliat and Earl into membership. On the following evening, Fred Nickens, the theater manager, approached Durliat and Earl in the lobby and walked Durliat outside the theater. There, Nickens said that he had heard a rumor that Durliat had joined the union. Durliat said he knew nothing of the rumor. The manager then asked if Durliat had been approached by anyone from the union. The employee replied that he had not. The manager then asked if Durliat had approached anyone from the union, and the employee replied "no." Then Nickens said, "think about it for a minute and then tell me if you have joined the union." Durliat "thought for a few moments" and then replied to Nickens: ". . . if I was to hear anything about a rumor that I would let him know."

On the same evening, Nickens asked Espen if he knew anything about the union, and Espen said he did not. Then the manager asked if the employee had joined or planned to join the union; Espen said no to both questions. Nickens then asked if "there was anyone else in on this union business," and the employee said there was not. Nickens then said, "You know, if you ever join the union, you cannot be a manager with the Armstrong Circuit."

On March 1, Earl was appointed regular projectionist at the Portage Drive-In for the 1970 season which was to begin on March 20. The union informed the respondent on March 20 that it represented the Portage Drive-In projectionists. On the following evening, David Krassow, manager of the drive-in, came into the projection booth and asked Earl, "[h]ave you talked to anybody from the big city lately?" The employee replied that he did not know what Krassow meant and that he did not know anyone from the big city. Earl testified, however, that he understood Krassow to be referring to the union which was based in Toledo.

On March 21, both Durliat and Earl were discharged. About a week later, John Mussman, a ramp attendant at the drive-in, asked Krassow where Earl was. Krassow answered that Earl was no longer employed. Mussman asked why, and the manager replied that "[h]e was suspected of having connections with the union." A few days later, Mussman asked Krassow if it were not illegal to fire someone for joining a union. Krassow replied that that was not the reason Durliat and Earl were given. Two weeks later Krassow told Mussman that he had considered Durliat and Earl friends until they got mixed up in "this union business." Krassow's testimony at the hearing was silent as to these conversations.

■ Concerning the Sec. 8(a)(1) violation, the Trial Examiner found that

1. All statutory references are to the Labor Management Relations Act, 1947, as amended, 29 U.S.C. § 141 et seq.

the questions and statement by Nickens to Durliat and Espen threatened the employees' job security and interfered with their rights under the Act. The Examiner found the questioning of Earl by Krassow to be similarly unlawful. Respondent contends that such findings, adopted by the Board, were erroneous because no coercion or anti-union animus was shown.

This Court, of course, must uphold the findings of the Board where they are supported by substantial evidence in the record considered as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951); 29 U.S.C. Sec. 160(e). Interrogation of employees per se is not unlawful. N.L.R.B. v. Dale Industries, Inc., 355 F.2d 851 (6th Cir. 1966). In determining whether the particular questioning in the instant case violates the Act we look to all the surrounding circumstances to determine whether it may reasonably be said that the interrogation "tends to interfere with the free exercise of employee rights under the Act." Hughes & Hatcher, Inc. v. N.L.R.B., 393 F.2d 557, 563 (6th Cir. 1968). The Trial Examiner considered, among other things, the following facts. Nickens immediately began singling out the employees and questioning them as soon as he heard rumors of union activity. Nickens did not just inquire into the sentiments of the particular employee whom he interrogated, but apparently used the questioning to investigate the activities of other employees. Each employee denied knowledge of union activities. As we noted in Hughes & Hatcher, Inc. v. N.L.R.B., *supra*, the interrogation "must be viewed and interpreted as the employee must have understood the questioning and its ramifications." 393 F.2d 557 at 563. Finally, the Examiner considered the fact that two of the three interrogated employees were discharged on the day following the union's notification to respondent that the union represented the projectionists.

From these facts the Examiner inferred that the interrogations were coercive. In N.L.R.B. v. Elias Brothers Big Boy, Inc., 325 F.2d 360, 364 (6th Cir. 1963), we observed that:

Except for subsequent events with respect to these two employees, the foregoing interrogations, standing alone, could not be held to be a violation of the Act. Following closely upon the heels of these interrogations, however, respondents committed acts with respect to each of the two interrogated employees which we hold to be unfair labor practices. Following the interrogation of Martha J. Brooks, Elias solicited and assisted her in withdrawing from the union, as hereinabove set forth. Within less than two weeks after the interrogation of Louise McCord, Greenfield discharged her discriminatorily for her union activities, as hereinafter discussed in some detail.

\* \* \* \* \* \*

In view of the subsequent unfair labor practices of respondents following so closely after the interrogations in question we cannot say that the Board was in error in holding that the interrogations had a relation to coercion or restraint of these two employees in their right of self organization.

We conclude that the finding of coercive interrogation is supported by substantial evidence. As in N.L.R.B. v. Elias Brothers Big Boy, Inc., *supra,* the employer's conduct subsequent to the interrogations was unlawful and reflects upon the prior questioning.

The Board found subsequent unlawful conduct in the discharge of Durliat and Earl. Respondent, of course, offers various business justifications for the firings. We have carefully considered these reasons as a part of the record which may tend to detract from the evidence relied upon by the Board. Appropriate here is our statement in N.L.R.B. v. Boot-Ster Mfg. Co., Inc., 405 F.2d 1210 (6th Cir. 1969), that "while this Court might have reached a contrary result if it were authorized to make *de novo* findings. The Board's or-

der is supported by substantial evidence." In addition to the suspicious timing of the firings here, the Board credited the undisputed testimony of Mussman that Krassow in effect admitted the anti-union purposes for the discharges. On the record before us we must affirm the findings of the Board.

Accordingly, enforcement of the Board's order is granted.