**VAN DORN PLASTIC MACHINERY COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 83–5012, 83–5118.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1984.

Decided June 8, 1984.

Rehearing and Rehearing En Banc Denied July 17, 1984.

---

Gregory A. Jacobs, Robert L. Larson, Keith A. Ashmus (argued), Thompson, Hine & Flory, Cleveland, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Patrick Szymanski (argued), Washington, D.C., for respondent.

Before LIVELY, Chief Judge, and JONES and CONTIE, Circuit Judges.

LIVELY, Chief Judge.

The most important issue in this labor case relates to the proper standard for determining whether communications from a union or an employer near the time of a representation election are sufficiently deceptive to require setting the election aside. After much vacillation the National Labor Relations Board (the Board) appears to have settled on a standard, stated in *Midland National Life Insurance Co.*, 263 NLRB No. 24 (1982), as follows:

> In sum, we rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is. As was the case in *Shopping Kart*, we will continue to protect against other campaign conduct, such as threats, promises, or the like, which interferes with employee free choice.

## I.

Van Dorn Plastic Machinery Company (Van Dorn) refused to bargain with District 54 of the International Association of Machinists and Aerospace Workers (the Union) following a Board-conducted election at which 151 employees at its Strongsville, Ohio, plant voted for the Union and 131 voted against it. In timely objections to the election Van Dorn charged several irregularities, including the allegation that the Union had distributed a flyer on election day which, while purporting to show that employees of another company had received favorable wage rates and benefits from a Union-negotiated contract, was in fact a forgery.

The Board's regional director conducted an investigation, without a hearing, and issued a recommendation that all of the objections be overruled. The Board adopted the regional director's findings and recommendation and certified the Union as the exclusive bargaining representative of Van Dorn's production and maintenance employees. The decision which finally brought the dispute to this court resulted from an amended complaint which consolidated several unfair labor practice charges which the Union filed in the wake of the election. In addition to charging Van Dorn with refusal to bargain with the certified representative of its employees, the Union charged the employer with unfair labor practices consisting of unilaterally changing its paid lunch period policy and unilaterally implementing a new attendance control policy, both without prior bargaining with the Union, and unlawfully interrogating and coercing employees.

Two hearings on the charges were held before an administrative law judge (ALJ), the second pursuant to a remand by the Board. Following the second hearing the ALJ issued a decision recommending a finding that the Union had misrepresented the actual negotiated wage rates in the flyer, but that the misrepresentation was not so substantial as to have significantly affected the election results. The ALJ thus determined that the certification was valid and that Van Dorn had violated section 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (5) (1976) by refusing to bargain with the Union. The ALJ also found that Van Dorn had interrogated and coerced employees in violation of section

8(a)(1), but that it had not violated section 8(a)(5) by implementing an attendance control policy and changing its paid lunch policy without prior bargaining. However, the ALJ did find that Van Dorn had violated section 8(a)(5) by not bargaining about the effects of the change in lunch policy.

## II.

### A.

In *Midland National Life*, the Board traced the history of its treatment of campaign propaganda. In the early years under the Wagner Act the Board disregarded issues of truth or falsity of campaign propaganda, assuming that employees would recognize propaganda for what it was, and discount it. *Midland National Life* at 129. Following passage of the Taft-Hartley Act the Board shifted its stand and set aside elections where it found that employees were deceived by trickery or fraud as to the source of campaign propaganda and were unable to recognize or evaluate propaganda. See *United Aircraft Corporation*, 103 NLRB 102 (1953). Another change in the Board's treatment of campaign propaganda occurred in *Hollywood Ceramics Company*, 140 NLRB 221 (1962). There the rule was announced that an election would be set aside "where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election." *Id.* at 224.

Fifteen years later the Board overruled *Hollywood Ceramics*, stating in *Shopping Kart Food Market, Inc.*, 228 NLRB 1311 (1977), that it would "no longer probe into the truth or falsity of the parties' campaign statements" but would intervene "in instances where a party has engaged in such deceptive campaign practices as improperly involving the Board and its processes, or the use of forged documents which render the voters unable to recognize the propaganda for what it is." *Id.* at 1311, 1313.

Incredibly, the Board overturned *Shopping Kart* and reinstated the *Hollywood Ceramics* standard less than two years later in *General Knit of California, Inc.*, 239 NLRB 619 (1978), and then reversed itself again in *Midland National Life*, returning to the rule of *Shopping Kart*. When the first hearing before the ALJ in the present case took place the *Shopping Kart* standard prevailed. On the last day of that hearing the *General Knit* decision was issued. By the time this case reached the Board for its final decision, *General Knit* had been discarded in favor of a return to the *Shopping Kart* standard in *Midland National Life*.

### B.

Applying its recently announced *Midland National Life* rule, the Board held that the election day flyer was not a forgery and, without analyzing the truth or falsity of the statements which it contained, determined that "the Union's campaign material involved here was not objectionable...." The Board thus upheld the finding of the ALJ that Van Dorn violated section 8(a)(5) by its refusal to bargain with the Union. The Board also upheld the findings of the ALJ that Van Dorn violated section 8(a)(1) by interrogating and coercing employees and by refusing to bargain with the Union on the effects of its unilateral change in the paid lunch policy. However, the Board disagreed with the ALJ in two respects. It found the unilateral change in Van Dorn's paid lunch policy during the pendency of its exceptions to the regional director's findings on its objections to the election to be a violation of section 8(a)(5) and (1). The Board also found the announcement of a change in Van Dorn's attendance control system in June 1978 a violation of section 8(a)(5) and (1). Van Dorn was ordered to cease its unfair labor practices, to recognize, and upon request, meet and bargain with the Union and to post a notice to its employees. The decision and order of the Board appear at 265 NLRB No. 36 (1982). Van Dorn filed a petition to review the decision and

order, and the Board filed a cross-application for enforcement.

### III.

#### A.

■ We agree with the ALJ that the flyer which was distributed by the Union shortly before the election contains misrepresentations concerning wage rates and, possibly, the identity of the union involved with the other employer. However, it is not a forgery. It is a memorandum to Van Dorn employees on IAM District Lodge 54 letterhead which purports to answer representations made in a pamphlet previously distributed by Van Dorn. An attached sheet lists job classifications and wage rates along with several excerpts from a collective bargaining agreement.

Van Dorn argues that the page of excerpts is a forged document because it is not clear what is real and what is fabricated. It also argues that it is a forgery because the Union intentionally blocked out the identity of the contracting local to give the impression that the agreement involved a near-by plant. In fact, the wage rates listed were those of a plant in California and were a compilation of base rates and premiums. As presented, the listed rates overstated the actual wages being paid. Anyone who examined the document would consider the list as having been taken from the collective bargaining agreement. Nevertheless, it was not a forgery merely because the rates presented were a compilation of the negotiated base rates and premiums. There was no claim by the Union that the listing was complete or that it was anything more than an example of the rates in one of IAM's contracts. Nor was it a forgery merely because the identity of the contracting local had been obscured. Measured by the *Midland National Life* standard, the Union flyer does not constitute a proper basis for setting aside the election.

#### B.

■ There remains the question of whether the *Midland National Life* standard should be adopted by this court. The Board enjoys a particularly broad discretion "in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946) (citations omitted). Our review of the Board's decision to narrow the instances in which an election will be set aside on the ground of campaign misrepresentations is limited to determining whether there has been an abuse of discretion. The test for determining whether the Board has abused its discretion is whether its orders have a "reasonable basis in law." Board orders have been held to have no reasonable basis in law, "either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning." *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

The purpose of any rule relating to representation elections is to insure that employees have an opportunity to make a free and fair choice, that their right under section 7 of the Act, 29 U.S.C. § 157 (1976), "to bargain collectively through representatives of their own choosing," is preserved. In *Midland National Life* the Board concluded that while the *Hollywood Ceramics* standard had been difficult to apply the *Shopping Kart* decision drew a clear line between permissible and objectionable propaganda and established a standard which "lends itself to definite results which are both predictable and speedy." *Midland National Life* at 131. The Board felt that this rule greatly reduced the incentive for protracted litigation and the resulting uncertainty which surrounds a contested election. In addition, the Board found that a return to its earliest attitude toward campaign propaganda represented a better understanding of the ability of employees to recognize and deal with campaign propaganda realistically. *Id.* at 132.

In *NLRB v. Semco Printing Center, Inc.*, 721 F.2d 886 (2d Cir.1983), the court dealt with allegations of misrepresentations concerning potential benefits of unionization. Though it found the misrepresentations trivial, and not objectionable under the more lenient standard of *Hollywood Ceramics*, the court specifically accepted the Board's *Midland National Life* rule. In doing so it noted the wide discretion given to the Board by Congress and the reasons for returning to the *Shopping Kart* rule as stated in *Midland National Life*, and concluded:

> There was thus a "reasonable basis in law" for the Board's return to the *Shopping Kart* analysis, and we defer to that decision. *See NLRB v. Hendrick's County Rural Electric Corp.*, 454 U.S. 170, 176, 102 S.Ct. 216, 221, 70 L.Ed.2d 323 (1981).

721 F.2d at 892. The same approach was taken by the court in *NLRB v. Monark Boat Co.*, 713 F.2d 355, 360 (8th Cir.1983), in electing to defer to the decision of the Board. The court in *NLRB v. Yellow Transportation Company*, 709 F.2d 1342 (9th Cir.1983) (per curiam), applied *Midland National Life* without discussion.

Reacting somewhat differently, in *NLRB v. New Columbus Nursing Home, Inc.*, 720 F.2d 726 (1st Cir.1983), the court applied the *Midland National Life* rule but adopted the rule "only with respect to the situation arising in the instant case." *Id.* at 728. In applying the rule the court concluded that the alleged misrepresentation "was scarcely likely to have affected the employees' free and fair choice." *Id.* at 729. In refusing to be bound by *Midland National Life* in all cases the court stated:

> Some misrepresentations may be so material and fraudulent as to undermine the employees' freedom of choice, rendering their section 7 right to self-organization a nullity. Were this such a case, the Board's flat insistence, under *Midland,* upon certifying the results of the fraudulent election might constitute legal error.

*Id.* Senior Judge Bailey Aldrich concurred specially, finding the *Midland National Life* rule "an abnegation of the Board's recognized duty to ensure a fair and free choice of bargaining." *Id.* at 730.

■ Though we have no hesitation in upholding the Board's decision on the issue of misrepresentation in the present case we do share the First Circuit's reluctance to be bound by the *Midland National Life* rule in every case. There may be cases where no forgery can be proved, but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected. We agree with the Board that it should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made. *Midland National Life* at 131. Thus considered the Board did not abuse the "wide degree of discretion" granted by Congress in rejecting Van Dorn's objections to the election. *See NLRB v. Basic Wire Products, Inc.*, 516 F.2d 261, 263 (6th Cir.1975).

### IV.

■ The Board disagreed with the ALJ's treatment of two of the unfair labor practices charges relating to unilateral changes in Van Dorn's paid lunch period and attendance control policies. Section 8(d) of the Act, 29 U.S.C. § 158(d) (1976), requires collective bargaining "with respect to wages, hours, and other terms and conditions of employment." A unilateral change with respect to a mandatory bargaining subject is a violation of section 8(a)(5). *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 674–75, 101 S.Ct. 2573, 2578–79, 69 L.Ed.2d 318 (1981); *NLRB v. Allied Products Corp.*, 548 F.2d 644, 652 (6th Cir.1977).

### A.

Prior to certification but after the election Van Dorn eliminated paid lunch periods for approximately 35 employees without offering to bargain on this issue with the Union. At the initial administrative hearing on the complaint, General Counsel

for the Board and Van Dorn's counsel stipulated in writing that the change was made "due to business necessity." Van Dorn agrees that its paid lunch policy is "a condition of employment" and that it acted unilaterally. However, it takes the position that the stipulation brought it within a recognized exception to the bargaining requirement, which permits unilateral changes based on "compelling economic considerations." See *Mike O'Connor Chevrolet-Buick-GMC Co., Inc.*, 209 NLRB 701, 703 (1974), *enf. denied on other grounds*, 512 F.2d 684 (8th Cir.1975). The ALJ construed the stipulated reason for the change in lunch policy—"business necessity"—as the equivalent of "compelling economic considerations." Thus, he excused Van Dorn from bargaining on the change, while requiring it to bargain on the effects of the change.

 The Board found that the stipulation did not satisfy the "compelling economic considerations" exception. On appeal Van Dorn argues that the stipulation was binding, and giving the words their ordinary meaning, clearly brought its action within the exception. It is not clear from this record what the parties intended when they entered into the stipulation. However, a stipulation once entered into should be construed to give it legal effect. *National Audubon Society, Inc. v. Watt*, 678 F.2d 299, 307 (D.C.Cir.1982). A remand is necessary to determine the correct interpretation of the stipulation. Van Dorn proceeded on the assumption that the stipulation relieved it of the duty to justify its failure to bargain on the change in lunch periods. The ALJ so construed the stipulation. If the stipulation is found to be ambiguous the Board must consider extrinsic evidence of the intention of the parties in entering into it. If the Board finds from such evidence that no agreement was actually reached and that the stipulation is a nullity, then fairness requires that Van Dorn be given an opportunity to establish "compelling economic considerations." In considering this question the Board would be required to categorize the lunch period action within the holding of *First National*

*Maintenance Corp.*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (a decision which is "almost exclusively 'an aspect of the relationship' between employer and employee" must be bargained but a decision which only has an "indirect and attenuated impact on the relationship" or is made to preserve the business and involves a fundamental change in scope or direction need not be bargained). Regardless of the outcome of the remand, we affirm the Board's holding that Van Dorn is required to bargain with respect to the effects of the lunch period decision. *Id.* at 677–78 n. 15, 101 S.Ct. at 2580–81 n. 15; see *NLRB v. Gray-Grimes Tool Co.*, 557 F.2d 1233 (6th Cir.), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

**B.**

 In June 1978 Van Dorn published a system for controlling employee attendance. It consisted of charging "points" for each absence or tardiness, with disciplinary action following the accumulation of seven points. When an employee complained that the policy had not been published previously, Van Dorn agreed to expunge all records of prior violations and announced that the policy would be effective July 1, 1978.

In his amended consolidated complaint the General Counsel alleged that Van Dorn violated section 8(a)(1) and (5) of the Act, "in or about June 1978" by unilaterally implementing a new attendance control policy. At the administrative hearing Van Dorn's director of employee relations testified that the point system announced in June had been in effect since January 1978. A point system had been maintained earlier, but the practice of recording absences and tardiness in effect at the time of the hearing had been implemented in January 1978. Upon inquiry by the ALJ, counsel for the General Counsel continued to maintain that the system had been implemented in June 1978 and that he was not seeking to amend the complaint. The ALJ found that the point system had been in effect for at least six months prior to June 1978 and

that no issue had been presented of a unilateral act as of January. He specifically credited the testimony of the Van Dorn official and concluded that merely publicizing the pre-existing system did not constitute an unlawful unilateral change in the absence of an allegation or proof that Van Dorn had publicized the policy in an effort to undermine the Union. No such allegation or proof appears in the record.

The Board disagreed with the conclusion of the ALJ and found that the General Counsel had made a prima facie case of an unlawful unilateral change in working conditions and that Van Dorn had failed to refute the prima facie case. It is unclear whether the Board found that publication of the attendance policy in June constituted a change in June 1978 or whether it concluded that it was sufficient that some change had been made after the election, probably in January 1978. We can find no evidence that a change was made in the employee attendance control system in June 1978. A finding of such a change on this record would not be supported by substantial evidence. If the Board based its decision on this issue upon a finding that the attendance control system was changed sometime prior to June 1978, the decision cannot stand. We agree with Van Dorn's contention that the Board abused its discretion if it permitted a constructive amendment to the complaint, particularly after counsel had confirmed that he was charging a unilateral change in June 1978. Further, a change in January would have been more than six months prior to the filing of the charge and would be barred under section 10(b) of the Act, 29 U.S.C. § 160(b) (1976).

It appears that there are no circumstances which would take this charge outside the six-months limitation bar. We do not need to explore that possibility, however, because it is clear to this court that the General Counsel never charged Van Dorn with a violation at any time other than June 1978 and that the hearing was conducted on the basis of that charge. This issue is controlled by our recent decision in *NLRB v. Homemaker Shops, Inc.*, 724

F.2d 535 (6th Cir.1984). Reviewing a similar set of circumstances, we denied enforcement of one of the unfair labor practice charges, stating:

> The fundamental fairness inherent in administrative due process cannot permit the General Counsel to plead a certain charge, insist at hearing that only that charge is being litigated, and then raise a related, but more onerous charge only after the hearing record is closed.

*Id.* at 544 (citations and footnote omitted). *Accord S.S. Kresge Company v. NLRB*, 416 F.2d 1225, 1234–35 (6th Cir.1969).

## V.

■ Van Dorn also asserts that the findings of violations of section 8(a)(1) in unlawful interrogation, restraint and coercion of employees are not supported by substantial evidence. We have examined the record with respect to these charges and conclude that the findings are supported by substantial evidence. Accordingly the Board's order will be enforced in this respect.

Other arguments by Van Dorn have been considered and found to be without merit.

## CONCLUSION

Enforcement of the Board's order is denied insofar as it finds a violation of the Act consisting of a unilateral implementation of an attendance control policy. The Board's order is vacated insofar as it finds a violation of the Act in Van Dorn's implementation of a lunch period policy, and we remand for further proceedings. In all other respects the order of the Board is enforced. The Notice to Employees will be modified to reflect this court's decision. No costs are allowed in these proceedings.

CONTIE, Circuit Judge, concurring and dissenting.

I fully agree with the majority's analysis of all issues presented in this case except one. Accordingly, I join in the majority opinion in every respect except for its determination in Part V that Van Dorn Vice-

President William Sheffield violated § 8(a)(1) by interrogating employee Thomas Vale. I conclude that Sheffield's conversation with Vale was not unlawful.

Strike votes were held by the Union on April 2, 1978 and May 7, 1978. Prior to each of these votes, Sheffield approached Vale at the latter's work station. Vale testified that Sheffield asked him on each occasion if he thought that the employees would vote in favor of a strike. Vale further testified that Sheffield stated that the employees did not need to strike and did not need a Union. Absent other evidence, these remarks would constitute substantial evidence of a § 8(a)(1) violation. Additional testimony of Vale, however, demonstrates that these conversations were not coercive.

One must begin with the proposition that, since an employer has the right to question employees in a noncoercive manner, see *NLRB v. Streamway Division*, 691 F.2d 288, 296 (6th Cir.1982), an employer's questioning of an employee is not per se unlawful. *NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 548 (6th Cir.1984); *NLRB v. Price's Pic-Pac Supermarkets, Inc.*, 707 F.2d 236, 239 (6th Cir.1983); *NLRB v. Armstrong Circuit, Inc.*, 462 F.2d 355, 357 (6th Cir.1972). Generally, "[i]n determining whether the ... particular questioning ... violates the Act we look to all the surrounding circumstances to determine whether it may reasonably be said that the interrogation 'tends to interfere with the free exercise of employee rights under the Act.' " *Armstrong Circuit*, 462 F.2d at 357 (quoting *Hughes & Hatcher, Inc. v. NLRB*, 393 F.2d 557, 563 (6th Cir. 1968)).

The single most important factor I rely on in concluding that Sheffield's conversation with Vale did not violate the Act is Vale's testimony that he did *not* feel coerced by Sheffield's questioning.[1] The rule that the Board does not have to show that an "employee was in fact intimidated," see *NLRB v. Electric Steam Radiator Corp.*, 321 F.2d 733, 736 (6th Cir.1963), and that the Board need only show that a given conversation "tends to interfere" with an employee's rights, see *Armstrong Circuit*, 462 F.2d at 357, has no application to a case in which the employee in question affirmatively testifies as to his subjective mental state at the time of the conversation. If the content and tenor of a given conversation "tends to interfere" with an employee's rights, we will infer, in the absence of evidence to the contrary, that the conversation was in fact coercive. Thus, it is true in such cases that the Board does not need to prove that the "employee was in fact intimidated." In the present case, however, there is evidence which squarely rebuts the inference of coercion: Vale's own testimony.

Several other elements of Vale's testimony add support to the conclusion that he was not coerced. First, in responding to Sheffield's inquiry as to the likelihood of a strike, Vale told Sheffield that he thought the employees probably would strike and then made a joke: "We wouldn't mind if you would save the old skids back there. We need it for a bonfire." Vale testified that Sheffield laughed at this remark. Second, Vale testified that he told Sheffield that he thought one of the supervisors should be fired. Third, there was nothing in Vale's testimony indicating that Sheffield made any statements which could be construed as an overt threat. Fourth, Sheffield did not question Vale about his personal feelings about a strike, only about the likelihood of a strike. Fifth, Sheffield commonly talked to employees and the conversation occurred at Vale's work station, where Vale presumably felt at ease, and not in Sheffield's office.

---

1. Vale testified as follows:
 Q. Let me ask if during either conversation you had with Mr. Sheffield you felt intimidated in any way?
 A. By Mr. Sheffield?
 Q. Yes, sir.

 A. He just asked me a question and I just answered it.
 Q. But you didn't feel afraid, did you?
 A. Afraid?
 Q. Yes.
 A. No, sir.

All of these factors lead to the conclusion that there was nothing coercive about Sheffield's conversation with Vale. Moreover, Vale's own testimony directly and expressly supports this conclusion. I would conclude that the Board's finding that this conversation was a violation of § 8(a)(1) of the Act is not supported by substantial evidence on the record considered as a whole.