774 F.2d 1164
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Charles P. Shanesy, Plaintiff-Appellee,
v.
Mid-America Federal, Defendant-Appellant.
 No. 84-3554
 United States Court of Appeals, Sixth Circuit.
 9/17/85
 
 S.D.Ohio
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
 Before: JONES and CONTIE, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Mid-America Federal (Mid-America hereinafter) appeals a judgment of the district court granting judgment in favor of plaintiff Charles P. Shanesy and awarding damages in the form of back-pay, reinstatement, attorney fees, and liquidated damages pursuant to the Age Discrimination in Employment Act, 29 U.S.C. Secs. 621 et seq. For the reasons that follow, we affirm.
 
 I.
 
 2
 On October 1, 1982, Shanesy, 52 years old, filed his complaint against Mid-America alleging that he was discharged on February 26, 1982 after being employed by Mid-America since November 1969. Shanesy alleged that he was promoted in 1977 and always received satisfactory or better than satisfactory evaluations. Plaintiff alleged that Mid-America purposely understaffed the branch bank at Dayton Mall, where he was manager, from April to October 1980, thereby causing him to receive an unsatisfactory evaluation. On about October 14, 1981, Shanesy was demoted and put on probation. He was the oldest of Mid-America's branch managers and was replaced by a younger, less qualified man. On February 26, 1981, Shanesy was discharged and replaced by a younger, less qualified woman. Shanesy alleged that Mid-America willfully terminated him due to his age, and sought back pay, back benefits and reinstatement or, in lieu of reinstatement, front pay.
 
 
 3
 On April 4, 1983, the case was referred to a Magistrate pursuant to 28 U.S.C. Sec. 636(c). On October 19, 1983, the magistrate ordered that the issues of liability and damages be bifurcated. Trial commenced on October 25, 1983, and the following evidence was received.
 
 
 4
 Shanesy testified that he began working in the savings and loan industry in 1956, and had been head teller and loan officer. Shanesy worked as assistant manager at the Far Hills branch of State Fidelity Savings and Loan in 1973, and in 1976 was promoted to assistant vice president and branch manager at the West Carrollton branch. Shanesy was told that the branch was doing a good job. In his evaluation of November 21, 1977, Shanesy received an above average review in all categories. As weaknesses, the evaluation noted 'procrastinates,' 'lack of delegation,' and 'too nice a guy.' As strengths, the evaluation read 'hard working, dependable and loyal.' In his evaluation of November 21, 1978, Shanesy again received better than average marks, and improved over the 1977 evaluation. As weaknesses, the evaluation listed 'managing all facets of the branch,' 'procrastinates in some areas,' and 'tell your staff your true feelings.' As strengths, the evaluation listed 'willingness to work no matter how many hours. Superior work production in loans. Very cooperative.'
 
 
 5
 Mr. Palmer, President of State Fidelity, asked Shanesy to do the loans and work out of the Dayton Mall branch. Shanesy took courses from the Savings and Loan Institute. During 1980, at Dayton Mall, Shanesy had eight employees, half full-time, while the previous manager had had ten employees, half full-time. In addition, Shanesy had more work than the provious manager due to more loans, and was not allowed to work employees overtime. Shanesy requested more staff but was refused. In his evaluation of September 23, 1980, Shanesy was rated at about one hundred percent by employee evaluators. Under areas for improvement, the management evaluator had written 'manage the branch by getting involved in managing. Tell employees what you expect from them. Don't spend 70 percent of time on lending. Delegate.'
 
 
 6
 In his evaluation of December 4, 1980, Shanesy had been rated as 'consistently handling all responsibilities required of this job.' Favorable comments were 'quantity of work. Good personality for the job. Job knowledge. (loans). Experience. Willingness to work.' Weaknesses were explained as:
 
 
 7
 Too lenient about whether the work is getting done on a daily basis. You don't check on employees enough so that they feel they are accountable to you for doing their job. You don't supervise the total operations of the branch enough. Chuck delegates duties and does not follow up to see that they are getting done.
 
 
 8
 Shanesy did not know of anything that wasn't getting done at the branch. The evaluations indicated that the recommendations should be accomplished by June 1981. The next evaluation was conducted August 24, 1981 and noted that 'improvement has been noticed in attitudes and lack of enthusiasm.' Shanesy was noted as 'consistently handling all responsibilities required of this job,' and showed improvement from the most recent evaluation. Shanesy's strengths were noted as 'not afraid to work. Volume of work is high. Good lending experience and likes lending related jobs. Dependable in attendance. Good knowledge of policy and procedures.' As weaknesses, the evaluation cited 'getting out of the office. Afraid to upset apple cart. Doesn't want to push or seem like he's complaining. Too mild-mannered with the staff and other State Fidelity employees.'
 
 
 9
 On October 14, 1981, Shanesy received his notice of demotion from Mr. Schmidt and Mr. Thompson. Shanesy was demoted to assistant manager at the Salem branch. While working at the branch the manager told him, 'you are busting your tail for nothing,' and that Shanesy 'would be better off to take the severance pay.' Shanesy was replaced by Debbie Hallet, in her late 20's, who Shanesy trained. Shanesy testified that 'ever since Mr. Palmer came, the older staff of State Fidelity one by one left one way or another.' Ten or twelve left.
 
 
 10
 On cross-examination, Mid-America brought out that there had been some errors in a few of the loans Shanesy had processed. Shanesy's evaluation as assistant manager indicated Shanesy 'needs to get back self-worth since it is noticed by employees and customers. Must go faster in learning the new areas of responsibilities, new accounts, balancing offices; is losing confidence of employees since he has to ask them how to do jobs he is supposed to be in charge of.' An audit of September 2, 1980 prior to demotion indicated '[t]here were 11 share loans which disclosure interest was calculated incorrectly, resulting in over disclosure to the customers.' In his last evaluation prior to being demoted, Shanesy was rated as 'consistently handling all responsibilities required of this job.'
 
 
 11
 Donald E. Patterson, Jr., and Robert Ackerman, Mid-America customers, testified that the Dayton Mall branch was competent and professional when Shanesy worked there. Ackerman referred others to Shanesy. Linda Parrott, a part-time employee at Dayton Mall, testified that Shanesy was a good manager, that the attitude of the staff improved when he took over, and that he had no problems dealing with staff. Michael Yoakum, a Mid-America management personnel, testified that the negative comment areas were almost always filled in on all evaluations. Yoakum never observed Shanesy procrastinate, fail to delegate, unable to make decisions or lack enthusiasm.
 
 
 12
 Raymond Rotellini worked with Shanesy at West Carrollton as a customer and referred others to him. Carol Nicolai, who worked under Shanesy, testified that Shanesy answered her questions and delegated responsibilities. Thomas Flynn, head of residential lending, testified that after Bob Palmer's arrival as president management employees in their 40s and 50s left the company. Flynn also testified that Palmer was trying to keep pension costs down. When Flynn left the company most branch managers were younger women. Flynn testified that Shanesy's performance was 'fine' compared to most branch managers. Marilyn Hardin also testified that management employees were replaced by younger employees. Janice Dacon who worked as assistant manager to Shanesy at Dayton Mall testified that Shanesy was helpful, that the staff knew what was expected of them, respected Shanesy, and that he was enthusiastic.
 
 
 13
 Plaintiff's expert Lawrence Hadley testified that at the time of Shanesy's termination Mid-America had 39 officials and managers, 15 of which were in the protected age class. There were seven involuntary terminations of the 39, four of whom were in the protected age class. Five of the termination employees were terminated due to reduction in force and four of the five were in the protected age group.
 
 
 14
 Howard Offenbacher worked for Mid-America for 20 years and testified that Shanesy had good work habits with respect to employees, customers, and realtors. Offenbacher said he was forced to resign and that President Palmer had a better rapport with middle management than senior management because it was Palmer's thrust to present a new image for the association.
 
 
 15
 Pamela Smedley testified that after Shanesy came to Dayton Mall there was a shortage of help, and after he left there was an increase in help. Robert Rice, a senior Mid-America executive, testified that he had to leave Mid-America because of the effect of Palmer's management style on his health. Rice testified that none of the persons who replaced Offenbacher was over 40. With respect to Offenbacher's farewell party, Palmer commented that 'I think I can probably arrange one of those every week.' Rice also testified that Palmer's relations with the younger middle management were less tense.
 
 
 16
 After plaintiff rested his case, Mid-America moved for a directed verdict, which the court denied.
 
 
 17
 I think that there is certainly a conflict in the evidence. There are different interpretations which can be placed on the evidence. Neither party has referred to the statistical evidence which Plaintiff seemed anxious to introduce. I notice the statistical evidence referred to by Plaintiff, I think, certainly can be the basis for an inference by the jury that age may have been a factor. On the other hand, the statistical evidence was somewhat selective.
 
 
 18
 In addition, there is oral testimony by Mr. Shanesy, as well as a number of other witnesses, from which the jury can, if credited, find that there was a pattern of removing individuals of a certain age. There may be an explanation for that, and that is a matter for the jury to determine.
 
 
 19
 The Sixth Circuit has held a prima facie case is established were plaintiffs produce evidence which, of course, has to be viewed in the light most favorable to the plaintiff, would permit a reasonable jury to find that he was discharged because of his age. On the other hand, if from the facts presented there is simply no reasonable inference to suggest Plaintiff was discriminated against because of his age, then he has failed to present a prima facie case.
 
 
 20
 Mary McCoy, Mid-America senior vice president, testified that Shanesy's attitude and delegation problems were serious in a branch manager. She also testified that the Dayton Mall store had the lowest rating in cross-selling new accounts or services to customers. McCoy also described queuing analysis by which the company decided how much staff they needed for each branch. Dayton Mall was overstaffed. With respect to the decision to transfer Shanesy, McCoy testified:
 
 
 21
 We talked about Chuck's strong points. And we talked about the fact that Chuck is more of a nuts and bolts person than a manager and that as an alternative the role of assistant manager might be able to capitalize on those strengths and we could salvage the situation.
 
 
 22
 McCoy testified that she was aware of the ADEA. McCoy indicated that she never talked to any of the Dayton Mall staff regarding Shanesy. The Association's in-house attorney Mr. Fraum was present in the meeting at which the decision to demote or transfer Shanesy was discussed. The decision was made based on performance appraisals.
 
 
 23
 Robin Frederick, who worked under Shanesy, testified that Shanesy could not answer her questions and that other tellers would come to her for the same reason. Further, Shanesy came to Frederick with questions. Shanesy told Frederick that he was afraid to answer questions because he might lose his job. Shanesy was the worst assistant manager Frederick had worked for.
 
 
 24
 Gerald Schmidt, who evaluated Shanesy, testified that 'Mr. Shanesy always did a tremendous quantity of work. He was a heavy worker. He loved work.' Otherwise, Schmidt's testimony consisted of an explanation of the comments he put on Shanesy's written evaluations. Schmidt kept a diary as to his contacts with Shanesy and comments on his performance. Schmidt discussed the meeting with regard to terminating or demoting Shanesy. Schmidt testified that he attempted to get Shanesy a position in lending, but there were no openings. Schmidt testified that there were customer complaints about Shanesy, and that the Dayton Mall branch had more errors than other branches. Also, there was a morale problem in the office. In 1981, the Association tried to get managers to be more savings-oriented, with a de-emphasis on lending, but Shanesy did not fit into this new model of the manager because '[h]e was having trouble adapting to savings and operations, that area, in his branch.'
 
 
 25
 Robert Palmer, president of State Fidelity until its merger, testified that when Shanesy was promoted to manager they knew he was not a good manager but promoted him because he was good at promoting loans and at public relations. Palmer also testified with respect to the queuing analysis. Shanesy was ranked as least productive of the branch managers. Palmer met with Shanesy twice to tell him that he was not adapting to the Association's switch to savings orientation. The merger of First Federal Savings and State Fidelity took place on January 1, 1982. On June 1, 1982, Ohio Federal and Franklin Federal joined the merger. Palmer testified that age was not discussed as part of the decision to demote Shanesy. Palmer testified that Offenbacher's presentations of loans to the Board of Directors was so bad that they demanded his ouster. Palmer testified that he was aware of the ADEA, and that he did not participate in the decision to terminate Shanesy.
 
 
 26
 Jean Letche, who worked under Shanesy at West Carrollton, testified that she found that the staff was not well cross-trained and that there was no leadership. Evelyn Alexander worked with Shanesy after his demotion and described how he poorly handled a situation involving some irate customers. Joe Thompson indicated that he had several meetings with Shanesy, who had botched up the scheduling. Thompson said age was not a factor in the decision to demote Shanesy. Thompson was one of the managers who informed Shanesy of his termination for not fulfilling the function of a branch manager. Thompson was aware of the ADEA.
 
 
 27
 Mark Cross, Shanesy's manager at Salem Avenue, testified that age did not affect his evaluation of Shanesy. Teresa Ellis, who worked under Shanesy, testified that he answered questions and helped the tellers. Ellis never heard complaints from customers about Shanesy. Morale was good. Jennifer Warrick worked with Shanesy at Dayton Mall and testified that he delegated work, worked well with employees and customers, and that morale was good.
 
 
 28
 On November 3, 1983, the jury returned answers to interrogatories finding that plaintiff had been demoted and discharged due to age discrimination and that such acts were willful. Trial on damages took place on December 19 and the jury returned a verdict of $34,079.00. Plaintiff moved for reinstatement and defendant moved for JNOV. On June 12, 1984, Judge Wesley Brown entered an order denying the JNOV, and granting liquidated damages of $34,079.00, costs of $2,950.00, attorney fees of $35,570.00 and reinstatement.
 
 II.
 
 29
 Mid-America asserts that the district court erred in stating the test for establishment of a prima facie case, and that, even if the standard articulated by the court were applied, plaintiff had not established a prima facie case. Mid-America contends that it was plaintiff's burden to show that he was performing his job satisfactorily. The district court stated that 'a prima facie case is established where plaintiffs produce evidence which . . . would permit a reasonable jury to find that he was discharged because of his age.'
 
 
 30
 The standard cited by the district court is exactly as set forth by this court in Rose v. National Cash Register Corp., 703 F.2d 225, 227 (6th Cir.), cert. denied, 104 S. Ct. 352 (1983). 'To say that plaintiff has established a prima facia case is simply to say that he has produced sufficient evidence to present his case to the jury, i.e. he has avoided a directed verdict. . . . Evidence is sufficient to preclude granting a motion for directed verdict when, in reviewing the evidence in the light most favorable to the non-moving party, it would permit a reasonable jury to find in favor of that party.' Id.[1]
 
 
 31
 It is sufficient if plaintiff shows that a reasonable jury could believe that age was a determining or motivating factor in the discharge. Blackwell v. Sun Electric Corp., 696 F.2d 1176, 1179-80 (6th Cir. 1983); Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 68 (6th Cir. 1982). No panel of this court has required a plaintiff alleging age discrimination to prove that he was performing to the satisfaction of his employer, and we decline to do so today. Accordingly, Mid-America's assignment of error is without merit.
 
 III.
 
 32
 Defendant challenged the jury instructions on the ground that the instructions could have led the jury to believe that the defendant had the burden to show good cause for the dismissal. The court instructed:
 
 
 33
 the plaintiff must prove by a preponderance of the evidence . . . that Plaintiff's age made a difference in determining whether Plaintiff was discharged.
 
 
 34
 Not every demotion or discharge of an individual between the ages of 40 and 70 is unlawful under the act. The act provided that, quote, it shall not be unlawful for an employer to take any action otherwise prohibited where the differentiation is based on reasonable factors other than age, quote. The act also provides that it is not unlawful for an employer to discharge or otherwise discipline an individual for good cause. If you find that Defendant removed Plaintiff from his position as branch manager, placed him on probation and determined that Plaintiff had not adequately performed during the probationary period for the reasons asserted by Defendant, and that Plaintiff's age either did not enter into the decision at all or did not make a difference in the employer's decision, then you must find in favor of the Defendant.
 
 
 35
 On the other hand, in order for you to find that there has been a violation of the Age Discrimination and Employment Act, you do not need to find that the Plaintiff's age was the sole or exclusive reason for his demotion or discharge. If you find by a preponderance of the evidence that Plaintiff's age was one factor in reaching the decision to demote or discharge Plaintiff and you find that his age made a difference in determining whether he was demoted or discharged, you must find for Plaintiff.
 
 
 36
 The instruction only explicitly conferred burdens on the plaintiff. This court has rejected challenges to sufficiently similar instructions before, Davis v. Combustion Engineering, Inc., 742 F.2d 916, 920 n.2, (6th Cir. 1984); Blackwell, 696 F.2d at 1180, and finds no error in this case.[2]
 
 IV.
 A. Liability
 
 37
 'Only if we are . . . of the opinion that reasonable minds could only have come to a decision contrary to that of the jury will we reverse the denial of judgment notwithstanding the verdict.' Williams v. Caterpillar Tractor Co., Case No. 84-5492, slip op. at 3 (6th Cir., August 9, 1985); Hill v. Spiegel, Inc., 708 F.2d 233, 237 (6th Cir. 1983). The ultimate issue in an ADEA case is whether age was a 'determining factor' in the employment decision. Rose, 703 F.2d at 227; Blackwell, 696 F.2d at 1181; Ackerman, 670 F.2d at 70. The company, even when it was quite dissatisfied with plaintiff, continued to give him good evaluations. This evidence allows the jury to infer dishonesty in the company's assessments of its employees, and together with the prima facie case and Shanesy's replacement by a younger employee is sufficient to allow a reasonable jury to conclude that Shanesy was discharged due to age.
 
 B. Willfulness
 
 38
 Regarding willfulness, the district court instructed:
 
 
 39
 A violation is willful where the employer acts deliberately, intentionally and knowingly in demoting and discharging Plaintiff because of his age. The violation is deliberate, knowing and intentional if the Defendant knew or had reason to know that its acts were governed by the Act.
 
 
 40
 Additionally, you may find that the violation is willful where the employer was reckless in not knowing that its actions were governed by the Act or acts with a reckless disregard of whether its actions were governed by the Act. And when I refer to the Act, I am referring to the Age Discrimination In Employment Act.
 
 
 41
 Importantly, the district court instructed that '[t]he violation is deliberate, knowing and intentional if the defendant knew or had reason to know that its acts were governed by the Act.' There is abundant evidence that reveal management level employees of defendant who participated in the decisions to demote and terminate plaintiff were aware of the proscriptions of the ADEA. Accordingly, under the instructions delivered by the district court, the jury's finding of willfulness is supported by the evidence.
 
 
 42
 The record does not reveal an objection by Mid America to the instruction on willfulness, nor were the instructions plainly erroneous pursuant to Trans World Airlines v. Thurston, 105 S. Ct. 613 (1985).
 
 C. Damages
 
 43
 Defendant raises several challenges to the jury's findings with respect to the damages awarded by the jury. We must uphold the jury's finding if they could be reached by any reasonable person construing the evidence in plaintiff's favor. Defendant had every opportunity to rebut the testimony of plaintiff's expert and argue its case to the jury. An appeal to this court cannot replace a want of proof at the trial level. We concur in Judge Brown's conclusion that the evidence does not warrant overturning the jury's award.
 
 V.
 
 44
 Mid-America alleges that the district court erred in failing to give effect to a stipulation between the parties regarding the availability of reinstatement. The stipulation, submitted during the course of trial, signed by counsel for Shanesy and Mid-America and filed on December 22, 1983, provided:
 
 
 45
 It is hereby stipulated by and between the parties that the Plaintiff will not be reinstated to his former employment and in lieu thereof Plaintiff may recover such future damages, if any, Plaintiff may prove.
 
 
 46
 The district court, noting that plaintiff moved to set the stipulation aside, set the stipulation aside because the stipulation was not approved by the court and '[i]t would be unjust to hold the parties to this 'agreement."
 
 
 47
 We have held, of course, that 'a stipulation once entered into should be construed to give it legal effect.' Van Dorn Plastic Machinery Co. v. NLRB, 736 F.2d 343, 349 (6th Cir. 1984), cert. denied, 105 S. Ct. 1173 (1985). However, this rule is limited to stipulations which are unambiguous. When a stipulation is ambiguous, the court 'must consider extrinsic evidence of the intention of the parties in entering into it.' Id. If the court 'finds from such evidence that no agreement was actually reached and that the stipulation is a nullity,' then the stipulation will not be enforced. Id. We have never held that court approval is required with respect to every stipulation reached by the parties.
 
 
 48
 Discussion of the stipulation at trial in December 1983 indicates that the parties had different views regarding its terms. Plaintiff's counsel contended that in the stipulation defendant conceded that plaintiff was entitled to any front pay and future earnings he could prove. Defendant contended that the stipulation covered only front pay and did not include future earnings. The court indicated that it was clear that the parties had not reached agreement.
 
 
 49
 I feel that we are in a situation now where, you know, Mr. Parks [plaintiff's counsel] is obviously under the impression that he can seek loss of future earnings which--it is no wonder he is under that impression, because of this stipulation. But as I understand, you are taking the position he is not entitled . . . to future earnings over his life expectancy?
 
 
 50
 The court further expressed its uncertainty regarding the effect of the stipulation, noting that 'if the law doesn't permit that [future earnings], I don't know that a stipulation can achieve it.' A review of the record indicates that neither the parties nor the court reached any definite conclusion regarding the meaning of the signed stipulation. Although the parties signed the stipulation, the fact that they could never agree on its meaning indicates that no real agreement was reached, and that the district court did not err in refusing to give effect to the stipulation.
 
 
 51
 Regarding the propriety of reinstatement in analogous Title VII cases, we have recently held that the decision to grant reinstatement is entrusted to the discretion of the trial court and a finding of discrimination presumptively entitles a plaintiff to reinstatement. Henry v. Lennox Industries, Inc., Case Nos. 84-3523, 3577 slip op. at 11 (6th Cir., July 29, 1985). 'Reinstatement has been found inappropriate where the plaintiff has found other work or could have, . . . where reinstatement would require displacement of a non-culpable employee or where hostility would result.' Id. at 12. Mid-America has demonstrated no reasons why reinstatement is inappropriate in this case, and, therefore, we do not disturb the district court's order of reinstatement.
 
 VI.
 
 52
 Defendant raises two assignments of error with regard to attorney fees. First, defendant argues that the district court erred in awarding a full award for the time spent preparing expert Hadley since plaintiff did not prevail on all claims on which Hadley testified. Much of Hadley's testimony, however, was in relation to successful claims. Plaintiff argues that since he substantially prevailed and was very successful, he was entitled to full attorney fees. In Hensley v. Eckerhart, 461 U.S. 424, 440 (1983), the Court held that the hours spent on unsuccessful claims should be excluded only when the unsuccessful claims are 'distinct in all respects from his successful claims.' Hadley's testimony on the pension benefits, while different from that with regard to other benefits, is not so distinct as to require a remand for recalculation of fees.
 
 
 53
 Second, defendant contends that since plaintiff's counsel was awarded fees, counsel should not also get the contingency fee negotiated with plaintiff. Defendant does not contend that it should pay less money, but only that the plaintiff should get the full award of damages. While it is unclear whether the defendant has standing to raise this issue since our ruling will not affect defendant's obligations, we have held that 'the determination of a reasonable fee is to be conducted by the district court regardless of any contract between plaintiff and plaintiff's counsel.' United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association, Local 307, v. G & M Roofing, 732 F.2d 495, 504 (6th Cir. 1984). Accordingly, defendant's assignment of error is meritless.
 
 
 54
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 29 U.S.C. Sec. 623(a)(1) provides:
 (a) It shall be unlawful for an employer----
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's age.
 
 
 [2]
 It is not entirely clear that the defendant would not be required to prove 'good cause' if he intended to rely on that exception to the ADEA 29 U.S.C. Sec. 623(f)(3) provides:
 It shall not be unlawful for an employer . . . to discharge or otherwise discipline an individual for just cause.
 See also 29 U.S.C. Sec. 623(f)(1). Once a plaintiff proves his case of discrimination, 'the burden shifts to the employer to prove that the termination falls within one of the exceptions to the ADEA's prohibitions.' EEOC v. County of Santa Barbara, 666 F.2d 373, 375 (9th Cir. 1982) (footnote omitted).