987 F.2d 359
 142 L.R.R.M. (BNA) 2585, 124 Lab.Cas. P 10,600
 DAYTON HUDSON DEPARTMENT STORE COMPANY, A DIVISION OF DAYTON
HUDSON CORPORATION, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Applicant,
International Union, United Automobile, Aerospace, and
Agricultural Implement Workers of America, Intervenor.
 Nos. 91-6197, 91-6314.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 11, 1992.
Decided March 1, 1993.
 
 Joseph Ritok, Jr. (briefed), Lauren A. Rousseau-Rohl (briefed), Timothy K. Carroll (argued and briefed), Dykema & Gossett, Detroit, MI, for petitioner/cross-respondent.
 Aileen A. Armstrong, Deputy Associate General Counsel, Howard E. Perlstein (briefed), Joan Hoyte (argued), N.L.R.B., Office of General Counsel, Washington, DC, Bernard Gottfried, Regional Director, N.L.R.B., Region Seven, Detroit, MI, for respondent/cross-applicant.
 Jordan Rosen, Nancy Schiffer (briefed), Associate General Counsel, Intern. Union, UAW, Detroit, MI, for intervenor.
 Before: KEITH and BATCHELDER, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 BATCHELDER, Circuit Judge.
 
 
 1
 Petitioner/Cross-Respondent, the Dayton Hudson Department Store Company ("Company"), owns and operates department stores, including Hudson's Department Stores. This action involves one such Hudson's Department Store, located at the Westland Mall in Westland, Michigan.
 
 
 2
 On May 11, 1990, pursuant to agreement of Intervenor, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("Union"), and the Company, the National Labor Relations Board ("Board") conducted a secret-ballot representation election at the Westland Mall Company store. Of the approximately 537 eligible voters, 274 cast votes for the Union and 179 against.[1]
 
 
 3
 On May 18, 1990, the Company filed timely objections to the election. On June 6, 1990, a hearing was held on the Company's objections. On June 21, 1990, the hearing officer issued a Report and Recommendations in which she recommended that the Company's objections be overruled and the Union be certified as the employee bargaining representative.
 
 
 4
 The Company then filed with the Board objections to the Report. On December 26, 1990, the Board issued a decision adopting the hearing officer's findings and certifying the Union as the exclusive bargaining representative.[2] The Union subsequently requested the Company to bargain collectively. The Company, however, refused to bargain.
 
 
 5
 On February 1, 1991, the Union filed an unfair labor practice charge with the Board. Following the issuance of a complaint, on May 15, 1991, the Board ordered the Company to bargain with the Union. However, on or about May 30, 1991, the Company filed a Motion to Reopen Record. The Company alleged in its motion that immediately prior to receipt of the Board's May 15, 1991 Order, it had obtained newly discovered evidence that, prior to the election, the Union used forged authorization cards to generate additional support for the Union. The Company contended that because this newly discovered evidence, if accredited, would necessitate a new election, the Board was required to order the record reopened and a new hearing held.
 
 
 6
 On September 30, 1991, the Board denied the Motion on the ground that even if the allegation that the Union had used forged cards to misrepresent Union strength were accepted as true, under Board precedent, the use of forged authorization cards, unaccompanied by any allegation that the cards were actually shown to any employees, was an insufficient basis for reopening the record. On October 15, 1991, the Company petitioned this court for review. On November 12, 1991, the Board filed a cross-application for enforcement. On July 21, 1992, this court granted the Union's Motion to Intervene.
 
 
 7
 For the reasons that follow, we remand this case with instructions to reopen the record and take additional evidence and to reevaluate this case in light of the analysis set forth herein.
 
 I.
 
 8
 The Company points to four incidents as the basis for its objections to the representation election.[3] The first of these involves the distribution of a letter by the Union to eligible voters. On or about May 8, 1990, three days before the election, the Union mailed to all eligible voters a letter that began with the greeting "Dear Fellow Hudson's Employee." The letter contains a number of references to "we" and "us" and purports to be authored by "Your Fellow Workers/The Westland Employees Organizing Committee." However, the Union concedes that the letter, which contains facts and arguments critical of the Company and supportive of Union representation, was actually prepared by a paid Union representative. The letter alleges, among other things, that the Company "claimed a profit of OVER 60 MILLION DOLLARS in our Westland Hudson's store alone last year ..." (emphasis in original). The Board acknowledges that the hearing officer was correct in finding that the total sales of this store for the previous year, 1989, were $52.5 million and the profits only $1.4 million, not $60 million, as claimed in the letter.
 
 
 9
 The second incident involves a leaflet that was handed out by the Union on the morning of the election. The leaflet contains the following passage:
 
 
 10
 Come Monday, [the Company] hope[s] to return to business as usual:
 
 
 11
 * * * * * *
 
 
 12
 Business as usual, where employees can retire with 17 years of service and must pay $43/mo. to maintain their health insurance and take home only $40/mo., while [Company executives] Mackey, Gibson and Watson will retire with huge pensions and no health insurance premiums.
 
 
 13
 The Company contends that this statement grossly misrepresents that Company executives receive preferential treatment as to health benefits. The Company also alleges that the timing of this leaflet, which was handed out within hours of the time the polls opened, and of the letter, which apparently was received by eligible voters shortly before the election, made it impossible for the Company to respond meaningfully to the alleged inaccuracies.
 
 
 14
 The third alleged election impropriety involves the presence of two Union representatives, Ray Westfall and Bob King, and a pro-Union employee, John Madgwick, for approximately eight to ten minutes during the morning election period,[4] in the restaurant cashier counter and candy counter areas,[5] a part of the Company premises that a Board agent had ruled off-limits for Company and Union representatives during the election. As found by the hearing officer, these three individuals were present in an area near which voters logically would travel to reach the polling area. However, the hearing officer also found that the only encounter between any of these individuals and an eligible voter occurred when Westfall, while outside a restroom that is across the corridor from the candy counter and adjacent to the buffeteria polling area, said "Hello" to one employee. There was no evidence that any other voters observed the three individuals, that they engaged in any electioneering while in this area, or that they engaged in any electioneering whatsoever in the buffeteria room itself.
 
 
 15
 The final incident to which the Company objected at the June 6, 1990 hearing involved allegedly coercive conduct by Union representative Westfall. On the morning of the election, in the presence of three employees who were handing out anti-Union literature, as well as a number of pro-Union employees, Westfall carried onto the Company premises a two-foot pipe wrench that the Union contended was to be used in opening a helium tank so that the Union could inflate balloons. However, according to the Union, because it was too windy for balloons, the wrench was not needed, and so Westfall "pitched" the wrench onto a nearby ledge approximately seven to fifteen feet away from the anti-Union employees. The Company contends that the Union had no need for the wrench because it knew the wind was too strong for balloons and, therefore, that Westfall's act of tossing the pipe wrench must have been intended to intimidate anti-Union employees. There was no evidence that Westfall or any other Union supporters uttered any threats or engaged in any other threatening conduct.
 
 II.
 
 16
 We address two issues on appeal. First, we must determine whether the Board erred in refusing to set aside the election on the basis of the alleged election improprieties. Second, we must determine whether the Board erred in denying the Company's motion to reopen the record and hold a new hearing on the issue of forged authorization cards.
 
 
 17
 We first consider the pipe wrench incident. We find that the Board did not err in refusing to set aside the election on the basis of this incident. A party seeking to set aside the results of a representation election "has the burden to show that the election was not fairly conducted." Tony Scott Trucking, Inc. v. NLRB, 821 F.2d 312, 316 (6th Cir.) (per curiam) (quoting NLRB v. Bostik Div., 517 F.2d 971, 975 (6th Cir.1975), cert. denied, 484 U.S. 896, 108 S.Ct. 230, 98 L.Ed.2d 188 (1987)). If the Board's findings are supported by substantial evidence, they will be upheld. Hickman Harbor Serv., a Div. of Flowers Transp. Co. v. NLRB, 739 F.2d 214, 218 (6th Cir.1984). Moreover, proof of physical threats, without more, will not suffice; "[r]ather, specific evidence is required, showing not only that the unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." Tony Scott Trucking, 821 F.2d at 316 (quoting NLRB v. Golden Age Beverage Co., 415 F.2d 26, 30 (5th Cir.1969)).
 
 
 18
 The Union provided a reasonable explanation for the presence of the pipe wrench on the Company premises, namely, to assist in opening a helium tank. When that became unnecessary, Westfall tossed the pipe wrench onto a ledge approximately three feet from where he was standing and seven to fifteen feet from where the anti-Union employees were standing. There is no evidence that any employees besides the pro-Union employees and the three anti-Union employees who were present ever saw the wrench. There is also no evidence that Westfall made any threatening gestures with the wrench or otherwise implied that he would use it against those anti-Union employees who were present. The Board's decision that this incident did not reasonably tend to interfere with the free and uncoerced choice of employees is supported by substantial evidence and, therefore, will be upheld.[6]
 
 
 19
 The Company also alleges that the presence for approximately eight to ten minutes during the election of Union representatives Westfall and King and pro-Union employee Madgwick in an area designated as off-limits by the Board agent warrants setting aside the election. The Company contends that voters going to or from the polling area would have had to pass by these individuals. The Company also points to the fact that Westfall admitted having spoken to one eligible voter during this time in the corridor adjacent to the buffeteria. The Company alleges that both Board precedent and court decisions, including a decision by this court, Kitchen Fresh, Inc. v. NLRB, 716 F.2d 351 (6th Cir.1983), require that a new election be held.
 
 
 20
 The Board has established a per se rule that certain types of election misconduct will, by themselves, warrant setting aside an election:
 
 
 21
 [W]e believe that the sustained conversation with prospective voters waiting to cast their ballots, regardless of the content of the remarks exchanged, constitutes conduct which, in itself, necessitates a second election.
 
 
 22
 Milchem, Inc., 170 N.L.R.B. 362, 362 (1968). This per se rule, however, does not extend to any conversation, no matter how slight:
 
 
 23
 [T]his does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election. We will be guided by the maxim that "the law does not concern itself with trifles."
 
 
 24
 Id. at 363. Where the conversation is not prolonged, and where it does not involve party representatives' conversing with voters waiting in line to vote or in the actual polling area, Milchem is inapplicable. Instead, under these circumstances, "the Board makes a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require the holding of a new election." Glacier Packing Co., 210 N.L.R.B. 571, 573 (1974). See also NLRB v. Duriron Co., 978 F.2d 254 (6th Cir.1992); Colquest Energy, Inc. v. NLRB, 965 F.2d 116, 120 (6th Cir.1992); Certainteed Corp. v. NLRB, 714 F.2d 1042, 1063 (11th Cir.1983); Boston Insulated Wire & Cable Sys. v. NLRB, 703 F.2d 876, 881 (5th Cir.1983).
 
 
 25
 The Company apparently contends that Milchem applies here. However, even were Milchem applicable at all where an encounter occurs outside the immediate polling area and does not involve an employee voting or waiting in line to vote, the isolated, innocuous comment by Westfall plainly would fall within the de minimis exception set forth in Milchem. See, e.g., NLRB v. Michigan Rubber Prods., Inc., 738 F.2d 111, 115-16 (6th Cir.1984); NLRB v. Oesterlen Servs. for Youth Inc., 649 F.2d 399, 400-01 (6th Cir.), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). Furthermore, a single chance comment, even if made in a designated no-electioneering area, to a single employee outside the immediate polling area during an election won by a margin of almost 100 votes falls far short of impairing the exercise of employee free choice within the meaning of Glacier Packing. See NLRB v. Del Rey Tortilleria, Inc., 823 F.2d 1135, 1140-41 (7th Cir.1987). Thus, this electioneering incident cannot be the basis for setting aside the election.[7]
 
 
 26
 The Company also alleges that both the letter that was mailed to eligible voters three days before the election and the leaflet that was handed out by the Union on election day are sufficiently egregious to require that this election be set aside. In evaluating the propriety of this campaign literature, we are guided by the Board's decision in Midland Nat'l Life Ins. Co., 263 N.L.R.B. 127 (1982) and our decision in Van Dorn Plastic Mach. Co. v. NLRB, 736 F.2d 343 (6th Cir.1984), cert. denied, 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985).
 
 
 27
 In Midland National Life, which represents the Board's current position on election campaign statements,[8] the Board enunciated the following rule:
 
 
 28
 [W]e rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is. As was the case in Shopping Kart [ Food Market, Inc., 228 N.L.R.B. 1311 (1977) ], we will continue to protect against other campaign conduct, such as threats, promises, or the like, which interferes with employee free choice.
 
 
 29
 Id. at 133. Midland National Life emphasizes the situations where voters are unable to recognize or evaluate union propaganda utilized in a deceptive manner so as to interfere with their free choice. Two years after the Board announced its Midland National Life rule, we decided Van Dorn, a case in which we applied a portion of a Board order addressing election misrepresentations. In dicta that mirrored certain concerns expressed in NLRB v. New Columbus Nursing Home, Inc., 720 F.2d 726, 730 (1st Cir.1983), however, we also indicated our "reluctance to be bound by the Midland National Life rule in every case." Van Dorn, 736 F.2d at 348. We cautioned that
 
 
 30
 [t]here may be cases where no forgery can be proved, but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected. We agree with the Board that it should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made.
 
 
 31
 Id. See also NLRB v. Superior Coatings, Inc., 839 F.2d 1178, 1181-82 (6th Cir.1988); Hickman Harbor, 739 F.2d at 217; Chicago Marine Containers, 745 F.2d at 498 n. 4. We continue to adhere to Van Dorn as representing a narrow but appropriate limitation on the expansive rule announced in Midland National Life--namely, that where the pervasiveness of misrepresentation or the artfulness of deception during an election campaign renders employees so unable to separate truth from untruth that their free and fair choice is affected, an election must be set aside even in the absence of proof that forgery has occurred.
 
 
 32
 While the leaflet distributed by the Union on the day of the election, standing alone, does not constitute either a forged document under Midland National Life or a "pervasive" and "artful" misrepresentation under Van Dorn, nevertheless we think the leaflet bears upon the "free and fair choice" inquiry we must address. Unlike the May 8 letter, the leaflet was not addressed to "Fellow ... Employee," nor did it purport to be authored by "Your Fellow Workers." This document was in leaflet rather than letter form, which reinforced the impression that it was campaign propaganda rather than a personal message from fellow workers. Additionally, the leaflet concluded with a portion of a mock ballot stating, in large letters, "UAW YES," accompanied by a check mark. This characteristic of the leaflet may have indicated to a reasonable employee that the leaflet was not a personal message from co-workers, but partisan propaganda. Thus, although the leaflet, like the May 8 letter, did contain references to "we" and "us," we believe the leaflet was probably recognizable as propaganda (under Midland National Life). If this were the only basis for challenge, we would hold that the leaflet was not (under Van Dorn) so deceptive or artful that employees' free and fair choice was affected. But this was not the only basis for challenge, and the leaflet's timing, coupled with the deceptive letter of May 8, leads us to a closer examination of the implications of the letter.
 
 
 33
 The May 8, 1990 letter is more troublesome. In its February 7, 1991 Decision and Certification of Representative, which adopted in toto the findings and recommendations of the hearing officer,[9] the Board concluded that the May 8 letter did not run afoul of Midland National Life because employees reasonably would have recognized this letter to be campaign propaganda, and the fact that the letter was actually prepared by the Union and not by the Dayton employees did not render it a forgery because other "employees would not reasonably be inclined to assume that the material in [it] originated exclusively from fellow employees and had no input from the UAW."[10] However, the three-member panel of the Board that rendered this Decision apparently considered the election only under the Midland National Life standard and did not examine the election in light of Van Dorn.[11] We, therefore, remand this case to enable the Board to reevaluate, in light of our reaffirmation here of Van Dorn, whether the May 8, 1990 letter, even if not a proven forgery, nonetheless contained misrepresentation and deception pervasive and artful enough to interfere with employees' fair and free choice to such an extent as to require a new election.
 
 
 34
 Finally, we remand this case for an inquiry into the allegations surrounding the authorization cards. In its May 15, 1991 Order Denying Motion to Reopen Record, the Board concluded that, because the Company did not allege that the authorization cards actually had been shown to any employees, the forged-documents exception under Midland National Life was inapplicable and, therefore, reopening of the record was not required. The Board, although not citing in its Order to Section 102.48(d)(1) of the Board's rules and regulations, relied on this section which provides as follows:
 
 
 35
 A party to a proceeding before the Board may, because of extraordinary circumstances, move for reconsideration, rehearing, or reopening of the record after the Board decision or order. A motion for reconsideration shall state with particularity the material error claimed and with respect to any finding of material fact shall specify the page of the record relied on. A motion for rehearing shall specify the error alleged to require a hearing de novo and the prejudice to the movant alleged to result from such error. A motion to reopen the record shall state briefly the additional evidence sought to be adduced, why it was not presented previously, and that, if adduced and credited, it would require a different result. Only newly discovered evidence, evidence which has become available only since the close of the hearing, or evidence which the Board believes should have been taken at the hearing will be taken at any further hearing.
 
 
 36
 29 C.F.R. § 102.48(d)(1) (1991). See also NLRB v. Lane Aviation Corp., 615 F.2d 399, 400-01 (6th Cir.1980). "The decision to grant or deny a new hearing under [Section 102.48(d)(1) ] is within the sound discretion of the Board, and will only be disturbed by a reviewing court if the challenging party establishes an abuse of discretion." May Dep't Stores Co. v. NLRB, 897 F.2d 221, 230 (7th Cir.) (and cases cited therein), cert. denied, 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990).
 
 
 37
 The Board's position as to the forged authorization cards is that, because the Company did not allege that the Union actually showed these cards to any employees, the "forged-documents exception" under Midland National Life does not apply. However, as developed both in the briefs and during oral argument, at the time the motion to reopen the record was filed,[12] the Company only possessed evidence that forged cards had been used to generate additional Union support, not that the cards actually had been shown to employees.[13] The Board, relying on Midland National Life, determined that, even if true as alleged, this use of forged cards, because it was tantamount to misrepresentation rather than forgery, would not require setting aside the election and, therefore, Section 102.48(d)(1) did not apply.
 
 
 38
 We disagree and find that the use of forged authorization cards to create a false picture of the extent of Union support, independent of whether the cards actually were shown to any employees, might constitute precisely the sort of pervasive misrepresentation and artful deception that we indicated in Van Dorn could, under the proper circumstances, be the basis for setting aside an election. In contrast to the use of a leaflet or even a letter that is distributed, and thus may at least be examined by employees to determine whether the representations made therein are true or untrue, the use of forged cards that are merely alluded to or otherwise utilized without being shown to employees deprives employees of the opportunity to evaluate the cards and determine that they are, or are not, propaganda. Arguably, therefore, such use of forged cards presents an even greater danger of misrepresentation and deception.
 
 
 39
 Because the use of forged cards to generate Union support, if this use prevented employees from separating truth from untruth and affected their right to a free and fair choice, would require a different result in the proceedings before the Board, the failure of the Board to grant the motion to reopen the record was an abuse of discretion. A hearing on this issue will ensure full inquiry into such questions as how many authorization cards were forged, the actual use to which those cards were put, when these incidents occurred, and whether and in what context any misrepresentations concerning the cards occurred.[14]
 
 III.
 
 40
 This case is remanded to the Board with the instruction that the Board reevaluate the May 8, 1990 letter in accordance with the principles set forth herein, and with the further instruction that the record be reopened and a new hearing held on the issue of forged authorization cards.
 
 
 41
 KEITH, Circuit Judge, dissenting.
 
 
 42
 Because I disagree with the majority's position that Van Dorn Plastic Mach. Co. v. NLRB, 736 F.2d 343 (6th Cir.1984), cert. denied, 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985), limits the applicability of the National Labor Relations Board's election campaign statements rule announced in Midland National Life Ins. Co. v. NLRB, 263 NLRB 127 (1982), I must respectfully dissent.
 
 
 43
 The majority correctly states the Board's rule regarding election campaign statements as articulated in Midland National Life and acknowledges that this is the "current position" of the Board. However, the majority attempts to sidestep the rule by relying on what it concedes to be "dicta" from Van Dorn, where the majority opinion stated a "reluctance to be bound by the Midland National Life rule in every case." Van Dorn, 736 F.2d at 348. This Court did not hold in Van Dorn that the rule established in Midland National Life should be limited. Chief Judge Lively, the author of the majority opinion in Van Dorn, merely stated that there may be reasons to limit the applicability of Midland National Life where there is misrepresentation or deception surrounding elections, but no proof of forgery. See id. I cannot concur with the majority's reliance on dicta as binding authority. Thus, I would strictly adhere to the Midland National Life rule requiring proof of forgery to set aside elections.
 
 
 44
 In the instant case, the Board found that there was insufficient evidence that forged documents were used to influence the election. The rule in this Circuit is that Board decisions should not be lightly set aside, but upheld if supported by substantial evidence. See NLRB v. First Union Management, Inc., 777 F.2d 330, 336 (6th Cir.1985). I would affirm the Board's decision as supported by substantial evidence.
 
 
 45
 Eight votes were cast for an intervening union. There were also seven challenged ballots. Neither of these facts is of further relevance here.
 
 
 
 [2]
 This decision was vacated by the Board on February 7, 1991 because of certain errors, and a new decision was substituted. However, the February 7, 1991 decision made no substantive changes in the earlier decision
 
 
 [3]
 One of the Company objections, Objection No. 1, was withdrawn by the Company after the hearing but before the hearing officer's report was issued
 
 
 [4]
 The polls were open on the day of the election from 10:00 a.m. to 2:00 p.m. and from 4:00 p.m. to 7:00 p.m
 
 
 [5]
 The buffeteria room, in which the voting took place, is approximately thirty to forty feet from the areas in which Westfall, King, and Madgwick were located
 
 
 [6]
 The cases cited by the Company are distinguishable as involving more egregious facts. See, e.g., NLRB v. Connecticut Foundry Co., 688 F.2d 871, 880-81 (2d Cir.1982) (Where a drawing of skull and crossbones was displayed to several voters waiting in line to vote, one voter described the drawing to other voters immediately after leaving polling area, a pattern of threats and violence characterized the campaign for six months prior to the election, and the election was decided by a vote of 100-95, the court denied enforcement of the Board's order); Exeter 1-A Ltd. Partnership v. NLRB, 596 F.2d 1280, 1281-84 (5th Cir.1979) (Where there occurred three separate incidents involving threats, swearing, and police involvement, and where the "highly belligerent and abusive" actions of union representatives were directed toward both management and employees, the combined effect of these "disruptive acts" necessitated denial of enforcement and setting aside of the election)
 
 
 [7]
 The post-Milchem cases and Board decisions cited by the Company involve more extreme facts than the present case. See, e.g., Kitchen Fresh, 716 F.2d at 359 (remanding for a hearing and stating that, under Milchem, if union representatives engaged in "any conversation with employees who were waiting to vote," a new election would be required); Bio-Medical Applications of Puerto Rico, Inc., 269 N.L.R.B. 827, 829 (1984) (where union representative, in violation of Board agent's instructions, remained for almost the entire election period in a waiting room adjacent to the polling area and spoke to four employees during this time, the Milchem rule was violated and the election was set aside)
 
 
 [8]
 The Board has vacillated in this area of the law, having reversed itself three times between 1962 and 1982. See NLRB v. Chicago Marine Containers, 745 F.2d 493, 497-98 (7th Cir.1984) (discussing the chronology of Board decisions in this area)
 
 
 [9]
 In its December 26, 1990 Decision, the Board adopted the hearing officer's findings and recommendations, including its finding that the May 8, 1990 letter was not a forgery within the meaning of Midland National Life. Although this Decision was later vacated and an amended Decision substituted therefor, the parties agree that the Board, in the amended Decision, again adopted the findings and recommendations of the hearing officer
 
 
 [10]
 Hearing Officer's Report and Recommendations, p. 5 n. 3
 
 
 [11]
 In a footnote in the February 7, 1991 Decision, the Board noted Member Oviatt's view that, in more extreme circumstances than were present here, even where there was no evidence of forgery, "the Board may sometimes be obliged to inquire ... whether the 'alleged misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and ... their right to a free and fair choice will be affected.' " February 7, 1991 Decision at 2 n. 3 (quoting Van Dorn, 736 F.2d at 348). Thus, there was at least some recognition among the Board members of the potential applicability of our Van Dorn decision under the proper circumstances
 
 
 [12]
 Board regulations require that a motion to reopen the record to adduce additional evidence "shall be filed promptly on discovery of such evidence." 29 C.F.R. § 102.48(d)(2) (1991). The Company alleges that it learned of the forged cards immediately before receiving the Board's May 15, 1991 Decision and Order requiring the Company to bargain with the Union. On or about May 30, 1991, the Company filed its Motion to Reopen Record on the basis of newly discovered evidence. Given that further information concerning the allegedly forged cards is uniquely within the knowledge and control of the Union, the inability of the Company, in its Motion, to provide further details concerning the use of forged cards without benefit of a hearing is hardly surprising
 
 
 [13]
 The Company also contends that the Board's application of Midland National Life to forged authorization cards conflicts with the Supreme Court's decision in NLRB v. Savair Mfg. Co., 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). In that case, the Court held that where a union promised to waive the initiation fee for employees who signed union recognition slips before the election, the election had to be set aside because it did not provide employees with a fair and free choice of bargaining representatives. Id. at 277, 94 S.Ct. at 498. The present case involves, not union recognition slips procured through economic inducement, but the use of forged authorization cards. However, although Savair thus is not directly applicable to the present case, the rationale of Savair--that the Board ought not to appear to sanction actions that favor one party over the other, id.--may have application where, as here, a party resorts to the use of forged authorization cards during an election campaign
 
 
 [14]
 We note that although this election was not decided by a handful of votes, a swing of approximately fifty votes from pro-Union to anti-Union would have changed the outcome of the election. On remand, in determining whether employee fair and free choice of a bargaining representative was affected, the Board, of course, may take into account this factor